**HAND-DELIVERED**

FILED
CHARLOTTE, NC

AUG 12 2021

US DISTRICT COURT
WESTERN DISTRICT OF NC

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, the STATE OF NORTH CAROLINA and the STATE OF TENNESSEE, *ex. rel.* ALANA SULLIVAN AND J. BRITTON TABOR, | Case No. 1:21 CV 219 |
| Relators, | **FILED UNDER SEAL** PURSUANT TO 31 U.S.C. §3730(b)(2) |
| vs. | **FALSE CLAIMS ACT – QUI TAM COMPLAINT** |
| MURPHY MEDICAL CENTER, INC. d/b/a ERLANGER WESTERN CAROLINA HOSPITAL and | **DO NOT PLACE IN PRESS BOX DO NOT ENTER ON PACER** |
| CHATTANOOGA-HAMILTON COUNTY HOSPITAL AUTHORITY d/b/a ERLANGER HEALTH SYSTEM, d/b/a ERLANGER MEDICAL CENTER; | JURY TRIAL DEMANDED |
| Defendants. | |

COMES NOW Alana Sullivan and J. Britton Tabor ("Relators"), in the above-styled *qui tam* action, by and through their attorneys, and state as follows:

1.     Relators bring this *qui tam* action on behalf of the United States of America under the Federal False Claims Act, 31 U.S.C. §§ 3729-3733 (the "FCA"), the State of North Carolina under the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605 et seq., and the State of Tennessee under the Tennessee Medicaid False Claims Act, T. C. A. §§ 71-5-181, et. seq. (collectively referred to as the "State FCAs") to recover treble damages and civil penalties and costs and fees as permissible under these statutes.

2. Defendant Murphy Medical Center, Inc. d/b/a Erlanger Western Carolina Hospital ("Murphy Medical") and Defendant Chattanooga-Hamilton County Hospital Authority d/b/a Erlanger Health System, d/b/a/ Erlanger Medical Center ("CHC Hospital Authority ") are separate legal entities but are collectively referred to herein as "Defendants" or "Erlanger". Defendant CHC Hospital Authority and Murphy Medical are under common control in that CHC Hospital Authority is the sole shareholder of Murphy Medical.

3. The Relators are the former Chief Compliance Officer and former Chief Financial Officer of Erlanger. They possess in-depth, firsthand knowledge of the fraud complained of herein. As set forth in detail below, beginning in April 2013 and continuing through the present, Erlanger offered, paid and provided unlawful kickbacks, excessive compensation and other illegal financial incentives to employed and non-employed physicians who refer patients to Erlanger, in violation of the federal physician self-referral law commonly referred to as the "Stark Law" (42 U.S.C. § 1395nn) and/or the federal anti-kickback statute commonly referred to as "AKS" (42 U.S.C. § 1320a-7b(b)). Erlanger violated the FCA and the State FCAs by knowingly submitting false claims for reimbursement to Government health care payers, including Medicare, TRICARE, CHAMPVA, FEHBP, federal Medicaid, the State of Tennessee Medicaid and the State of North Carolina Medicaid (hereinafter collectively referred to as "Government Payers" or "Government Health Care Programs"), for healthcare services referred by the physicians to whom Erlanger was paying the illegal kickbacks, excessive compensation and/or other illegal financial incentives. Those claims were false because they were not eligible for reimbursement. Moreover, when submitting those false claims for reimbursement, Erlanger falsely, expressly certified to those Payers that it was in compliance with the Stark Law and the AKS.

2

4. Another way that Erlanger violated the FCA and the State FCAs is its improper retention of payments from Government payers for false claims that Erlanger knew were not eligible for payment because they were tainted by violations of the Stark Law and or the AKS. Erlanger had an obligation to pay back such overpayments but chose not to do so, in violation of the FCA and the State FCAs.

5. Erlanger's submission of claims that were not eligible for payment due to Erlanger's violations of the Stark Law and the AKS, its false express certification of compliance with those laws, and its failure to return known overpayments are material to the Government Payers' decisions to pay Erlanger's false claims as a matter of law. The Stark Law statutorily prohibits such Government payments for services referred by physicians paid in violation of the Stark Law. *See* 42 U.S.C. § 1395nn(g)(1); 42 U.S.C. § 1396b(s). Claims for reimbursement for services resulting from a violation of AKS are by statute false or fraudulent under the FCA. 42 U.S.C. § 1320a-7b(g).

6. Relators have insider knowledge of Erlanger's compensation arrangements with physicians employed by Erlanger and Erlanger's valuation of their referrals; and of Erlanger's payments of remuneration to high referring, non-employed physicians to induce their referrals and of Erlanger's valuation of those illegal referrals.

7. Although not required to be pled for all of Relators' FCA and the State FCAs claims, Relators set forth herein six (6) representative examples of actual false claims to a Government Payer, Medicare or Tennessee Medicaid, for services referred to Erlanger by employed physicians whose compensation violated the Stark Law.

3

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. 28 U.S.C. § 1331 and supplemental jurisdiction over claims arising under the State FCAs, as provided under 28 U.S.C. §1367(a).

9.      This Court may exercise personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a), because (without limitation) Defendant Murphy Medical Center, Inc. resides and transacts business in the Western District of North Carolina.

10.     Venue is proper in the Western District of North Carolina pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391, because Defendant Erlanger (via Murphy Medical Center, Inc.) resides and transacts business in such district, and acts proscribed by 31 U.S.C. § 3729 were committed in such district.

## THE PARTIES

11.     Relator Alana Sullivan is the former Senior Vice President and Chief Compliance Officer of Erlanger, a position she held for thirteen (13) years, from 2006 until she was let go in 2019 allegedly as part of a reduction in force in which Erlanger downgraded the position of chief compliance officer to a director level position reporting to the Chief Legal Officer as a part of the dismantling of the compliance program. In reality, Relator Sullivan was let go because she insisted on delving into Erlanger's physician compensation schemes that she believed violated the Stark Law and/or the AKS.

12.     Ms. Sullivan was hired in 2006 to implement a corporate integrity agreement ("CIA") that Erlanger entered into with the United States Department of Health and Human Services as part of a settlement of an FCA case brought by the U.S. Department of Justice. That FCA case involved Erlanger allegedly submitting false claims to Medicare for services referred by

4

physicians to whom Erlanger paid compensation that violated the Stark Law. That CIA expired in 2011.

13.    Relator J. Britton Tabor is the former Chief Financial Officer of Erlanger. He has a masters level degree in business administration (commonly known as an MBA) and is a certified public accountant (CPA). He worked for Erlanger Heath for 34 years before he was let go in April 2021 because he identified excessive construction costs that Erlanger was paying to an architect and engineering firm in which an Erlanger Board member had a financial interest, and he was summarily fired. Relator Tabor started with Erlanger in 1986 as a Budget Manager. He became the Senior Vice President and Chief Financial Officer in 2006. Since 2006, Relator Tabor was a participant on the Executive Physician Contract Committee that determined physicians' compensation levels. His job duties included, among other things, supervising the development and creation of periodic reports to Erlanger senior management and the physician contract committee of the Erlanger senior leadership team that showed the compensation paid to each employed physician and physicians contracted with Erlanger which took into account the value of the referrals of healthcare services to Erlanger from each such physician. Relator Tabor also oversaw the creation of *pro formas* for the Erlanger senior management and the physician contract committee that projects the value and volume of referrals from each physician to be employed or who is employed by Erlanger and physicians contracted with Erlanger, so Erlanger could base each physician's compensation on that referral information.

14.    Relator Tabor has in-depth knowledge of Erlanger's billing processes, including billing Government Payers for referrals to Erlanger from employed and non-employed physicians. He has in depth knowledge of the financial arrangements between Erlanger and University

5

Surgical Associates, P.C., a large surgery physician group that is not employed by Erlanger that Erlanger richly compensated to induce referrals of surgery-related services to Erlanger hospitals.

15.     Mr. Tabor also has extensive knowledge of Erlanger paying additional compensation to high-referring physicians (both employed and non-employed) via a pass-through scheme at the University of Tennessee College of Medicine ("UT COM"): Erlanger told UT COM what to pay the referring physicians as UT COM faculty members, including how much to pay each of them, and Erlanger reimbursed UT COM for all such payments to physicians who referred services to Erlanger hospitals. Some of those paid by Erlanger through UT COM did not even have faculty duties. Erlanger also paid some physicians via UT COM by having UT COM make them eligible for State of Tennessee employee benefits even though they were not employed by UT COM and thus not eligible for State benefits.

16.     The United States is the real plaintiff party in interest in this action under the FCA, even though it permits *qui tam* relators to pursue the action on its behalf. See *U.S. ex rel. Milam v. Univ. of Texas M.D. Anderson Cancer Ctr.*, 961 F.2d 46, 50 (4th Cir. 1992).

17.     Defendant Erlanger provides comprehensive healthcare services in southeastern Tennessee, north Georgia and western North Carolina. Erlanger owns and operates a network of seven (7) affiliated hospitals, imaging centers, express care facilities, multi-use centers, and health centers in Tennessee and North Carolina. Erlanger is the ultimate corporate parent of its hospital healthcare network and exercises control by and through its ownership, management and affiliation of the two defendants named in this Complaint.

18.     Erlanger hospitals include:

- Erlanger Baroness Hospital, Chattanooga, TN

- Children's Hospital at Erlanger, Chattanooga, TN

6

- Erlanger North Hospital, Chattanooga, TN

- Erlanger East Hospital, Chattanooga, TN

- Erlanger Bledsoe Hospital, Pikeville, TN.

- Erlanger Western Carolina Hospital, Murphy, NC (a/k/a/ Murphy Medical Center)

- Erlanger Behavioral Health Hospital, Chattanooga, TN (Erlanger 20% joint venture partner)

19.     Defendant Murphy Medical is a North Carolina non-profit corporation, whose principal business location is 3990 US Highway 64 E Alt, Murphy, NC 28906, and whose registered agent is Matthew Thomas located at 3990 US Highway 64 E Alt, Murphy, NC 28906.

20.     Defendant CHC Hospital Authority is a hospital authority established by two private acts under Tennessee laws: 1976 Tenn. Priv. Acts ch. 297, as amended by 1977 Tenn. Priv. Acts ch. 125.  In substance, the 1976 Act created the Hospital Authority to operate Baroness Erlanger Hospital, T. C. Thompson Children's Hospital and other health facilities in order to provide consolidated health services to the residents of both Chattanooga and Hamilton County. The 1977 Act expressly ratified and amended the former Act and, in more elaborate detail, provided for the powers, duties and financial operation of the Hospital Authority.  The 1976 Act was passed pursuant to article XI, section 9, para. 9 of the Tennessee Constitution, which allows the General Assembly to provide for the consolidation of any or all governmental and corporate functions of municipal corporations with the counties in which the city is located only upon referendums in "home rule" municipalities.

21.     A county-wide referendum on August 5, 1976, approved the 1976 Act.  The 1977 Act provided for, and received, the approval of the county council of Hamilton County by a two-

thirds vote. The Tennessee Supreme Court held that the creation of the Hospital Authority was constitutional. *Chattanooga-Hamilton Cty. Hosp. Auth.* v. City of Chattanooga, 580 S.W.2d 322, 324 (Tenn. 1979). The principal business address of the Hospital Authority is 975 E. 3rd Street, Chattanooga, TN 37403-2147, and its registered agent is National Registered Agents, Inc. located at 300 Montvue Rd., Knoxville, TN 37219-5546.

22. The allegations made in this Complaint are based on Relators' personal and specific knowledge, obtained in their capacity as employees and senior managers of Erlanger.

23. Relators have specific inside knowledge of the frauds set forth in this Complaint.

24. Relators are "original sources" of the information alleged herein and are otherwise authorized to maintain this action in the name of the United States, North Carolina and Tennessee as contemplated by the FCA and the State FCAs.

25. Relators have made voluntary disclosures to the United States Government, Tennessee and North Carolina prior to the filing of this lawsuit as required by the FCA and the State FCAs.

## I. THE FALSE CLAIMS ACT

26. The FCA provides for the award of treble damages and civil penalties for, *inter alia*, knowingly submitting or causing the submission of false or fraudulent claims for payment to the United States government. 31 U.S.C. §. 3729.

27. Pursuant to 31 U.S.C. § 3729(a)(1)(A), a person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, for each false claim, plus 3 times the amount of damages which the Government sustains because of the act of that person.

8

28.     Pursuant to 31 U.S.C. § 3729(a)(1)(B), a person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, for each false claim, plus 3 times the amount of damages which the Government sustains because of the act of that person.

29.     Pursuant to 31 U.S.C. § 3729(a)(1)(G), a person who knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, plus 3 times the amount of damages which the Government sustains because of the act of that person.

30.     The term "material" is defined as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." FCA, 31 U.S.C. § 3729(b)(4) (2009); NC FCA, N.C. Gen. Stat. §1-606(5); TN FCA, T.C.A. §71-5-182(e).

31.     No specific intent to defraud the Government is required in order to violate the FCA and State FCAs. FCA, 31 U.S.C § 3729(b)(1)(B); NC FCA, N.C. Gen. Stat. §1-606(4); TN FCA, T.C.A. §71-5-182(b)(3). The terms "knowing" and "knowingly" are specifically defined in the FCA and the State FCAs as follows:

(A) mean that a person, with respect to information--

　　　(i) has actual knowledge of the information;

　　　(ii) acts in deliberate ignorance of the truth or falsity of the information; or

　　　(iii) acts in reckless disregard of the truth or falsity of the information; and

(B) require no proof of specific intent to defraud; . . . .

9

FCA, 31 U.S.C. § 3729(b)(1)(A) (2009); NC FCA, N.C. Gen. Stat. §1-606(4); TN FCA, T.C.A. §71-5-182(b).

32.     The term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment. FCA, 31 U.S.C. § 3729(b)(3); NC FCA, N.C. Gen. Stat. §1-606(6); TN FCA, T.C.A. §71-5-182(d).

33.     Any overpayment retained by a person after the later of 60 days after the date on which the overpayment is identified or the date any corresponding cost report is due, if applicable, is an "obligation" as defined in FCA 31 U.S.C. § 3729(b)(3).  42 U.S.C. § 1320a-7k(d).

## II.     THE MEDICARE PROGRAM

34.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of certain healthcare services.  42 U.S.C. §§ 426, 426A.

35.     The United States of America, acting through the Department of Health and Human Services ("HHS"), is responsible for the administration and supervision of the Medicare program.

36.     The Centers for Medicare and Medicaid Services ("CMS") is an agency of HHS and is directly responsible for the administration of the Medicare program.

37.     Medicare has several parts, including Part A (which is primarily for hospital-based charges, hereinafter referred to as "Medicare Part A" or "Part A") and Part B (which is primarily for physician services and other ancillary costs and services, hereinafter referred to as "Medicare Part B" or "Part B").

38.     The Medicare Part A program authorizes payment for institutional care, including hospital, skilled nursing facility and home health care.  42 U.S.C. §§ 1395c-1395i-4.

39.     Most hospitals, including Erlanger's hospitals, derive a substantial portion of their revenue from the Medicare program.

40.     Providers who participate in Medicare Part A must periodically sign and submit to CMS an application for participation in the Medicare program, *to wit*, a Hospital Insurance Benefit Agreement (Form HCFA-1561), under which each hospital agrees "to conform to the provisions of Section 1866 of the Social Security Act and applicable provisions in 42 CFR, Parts 405, 466, 420, and 489."

41.     Each of the Defendants has executed and submitted to CMS a Hospital Insurance Benefit Agreement (Form HCFA-1561).

42.     Providers who participate in Medicare Part A must periodically sign and submit to CMS Form 855A – Medicare Enrollment Application – Institutional Providers.

43.     Each of the Defendants executed and submitted to CMS a CMS Form 855A – Medicare Enrollment Application – Institutional Providers.

44.     By executing and submitting CMS Form 855A, each of the Defendants expressly certified to CMS as follows:  "I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider…I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including but not limited to, the Federal Anti-Kickback Statute and the Stark Statute, each defined below), and on the provider's compliance with all applicable conditions of participation in Medicare."

45.     Medicare Administrative Contractors ("MACs") act on behalf of CMS to process and pay Part A and Part B claims and perform administrative functions on a regional level.  See 42 § C.F.R. 421.5(b).  MACs are responsible for processing and paying claims and cost reports.

11

46.     The MAC for the States of North Carolina, Tennessee and Georgia is Palmetto GBA, LLC.

47.     Hospitals submit Medicare Part A claims to the MAC for payment.

48.     Physicians or other providers submit Medicare Part B claims to the MAC for payment.

49.     Under Part B, Medicare will generally pay 80 percent of the "reasonable" charge for medically necessary items and services provided to beneficiaries. *See* 42 U.S.C. §§ 13951(a)(1), 1395y(a)(1). For most services, the reasonable charge has been defined as the lowest of: (a) the actual billed charge, (b) the provider's customary charge, or (c) the prevailing charge for the service in the locality. 42 C.F.R. §§ 405.502-504.

50.     Following the discharge of Medicare beneficiaries from a hospital, the hospital submits claims for interim reimbursement for items and services delivered to those beneficiaries during their hospital stays. 42 C.F.R. §§ 413.1, 413.60, 413.64. These hospitals submit patient-specific claims for interim payments on a CMS Form UB-04 (formerly UB-92).

51.     As a prior condition to payment by Medicare, CMS requires hospitals to submit on an annual basis a form CMS-2552, more commonly known as the "Hospital Cost Report" (sometimes also referred to as the "Medicare Cost Report"). These Cost Reports are the final claim that a provider submits to the MAC for items and services provided to Medicare beneficiaries.

52.     After the conclusion of each hospital's fiscal year, the hospital files its Hospital Cost Report with the MAC, stating the amount of reimbursement the provider believes it is due for the year. *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20; *see also* 42 C.F.R. § 405.1801(b)(1).

53.     Medicare relies upon each hospital's Hospital Cost Report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or

12

whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

54.     At all times relevant to this Complaint, each of the Defendants were required to submit and did submit Hospital Cost Reports to the MAC.

55.     The Medicare payments for inpatient hospital services are determined by the claims submitted by the provider for particular patient discharges (specifically listed on UB-04s) during the course of the fiscal year. On the Hospital Cost Report, this Medicare liability for inpatient services is then totaled with any other Medicare liabilities to the provider. This calculation determines Medicare's true liability for services rendered to Medicare beneficiaries during the course of a fiscal year. From this sum, the payments made to the provider during the year are subtracted to determine the amount due the Medicare program or the amount due the provider.

56.     Under the rules applicable at all times relevant to this complaint, Medicare, through its MACs, had the right to make retroactive adjustments to Hospital Cost Reports previously submitted by a provider if any overpayments have been made. 42 C.F.R. § 413.64.

57.     Each Hospital Cost Report contains an express certification that must be signed by the chief administrator of the provider or a responsible designee of the administrator.

58.     The Hospital Cost Report Certification is a preface to the cost report's certification, the following warning appears:

> MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT.

13

This advisory is followed by the actual certification language itself:

CERTIFICATION BY OFFICER OR ADMINISTRATOR OF PROVIDER(S)

I HEREBY CERTIFY that I have read the above statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by [name of facility, ID number of facility] for the cost reporting period beginning [date] and ending [date] and that to the best of my knowledge and belief, it is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of the health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations. (This is followed by: signature of facility's officer, title and date).

59.     Each of the Defendants is required to be familiar with the laws and regulations governing the Medicare program, including requirements relating to the completion of cost reports.

60.     A hospital is required to disclose all known errors and omissions in its claims for Medicare reimbursement (including its cost reports) to its MAC. 42 U.S.C. § 1320a-7b(a)(3) specifically creates a duty to disclose known errors in cost reports:

Whoever…having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment…conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized…shall in the case of such a…concealment or failure…be guilty of a felony.

61.     Hospital Cost Reports submitted by the Defendants were, at all times material to this complaint, signed by their respective authorized employees (including employees of its various predecessors), usually a hospital official who attested, among other things, to the certification quoted above.

62.     During the relevant time period, the Defendants electronically submitted claims to Medicare Part B for professional services in ANSI ASC X12N 837 Professional format. The

14

Defendants were required to certify, and did certify, by electronically signing each claim submitted to Medicare in 837 Professional format:

"this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law)."

63.     Medicare providers like Defendants are reimbursed for covered services based on their submission of an electronic or hard copy claim form called the CMS Form 1500 Health Insurance Claim Form.

64.     When submitting claims using the CMS 1500, Defendants and other providers certify, *inter alia*, that "this claim . . complies with "with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law)."

65.     In making payment decisions, the Medicare program relies on providers to submit truthful and accurate certifications.

67.     Generally, once a provider submits CMS Form 1500 or its electronic equivalent to Medicare, the claim is paid directly to the provider, in reliance on the provider's certifications.

68.     Defendants knew they were falsely expressly certifying compliance with the Stark Law and the AKS in each claim for reimbursement for services referred by physicians to whom they were paying kickbacks, or to whom they were paying compensation that violated the Stark Law.

## III.    THE MEDICAID PROGRAM

69.    The Medicaid Program is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled.

70.    The federal Medicaid statute sets forth certain minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation (FFP). 42 U.S.C. §§ 1396 *et seq.*

71.    In order to qualify for FFP, each state's Medicaid program must meet certain minimum requirements, including the provision of hospital services to Medicaid beneficiaries. 42 U.S.C. § 1396a(10)(A), 42 U.S.C. § 1396d(a)(1)-(2).

72.    In Tennessee, provider hospitals participating in the Medicaid program submit claims for hospital services rendered to beneficiaries to TennCare Managed Care Organizations for payment.

73.    In North Carolina, provider hospitals participating in the Medicaid program submit claims for hospital services rendered to beneficiaries to the North Carolina Department of Health and Human Services for payment.

74.    In some states, provider hospitals participating in the Medicaid program file a copy of their Medicare Cost Report with the Medicaid program, which is then used by Medicaid or its intermediaries to calculate Medicaid reimbursement. In other states, provider hospitals file a separate Medicaid Cost Report. Medicaid providers incorporate the same type of financial data in their Medicaid Cost Reports as contained in their Medicare Cost Reports and include data concerning the number of Medicaid patient days at a given facility.

16

75.     Most states which require the submission of a Medicaid Cost Report also require an authorized agent of the provider to expressly certify that the information and data on the cost report is true and correct.

76.     Individual Medicaid programs use the Medicaid patient data in the cost report to determine the reimbursement to which the facility is entitled. The facility receives a proportion of its costs equal to the proportion of Medicaid patients in the facility.

77.     Where a provider submits the Medicare Cost Report with false or incorrect data or information to Medicaid, this necessarily causes the submission of false or incorrect data or information to the state Medicaid program, and the false certification on the Medicare Cost Report necessarily causes a false certification to Medicaid as well. When a provider submits a Medicaid Cost Report containing the same false or incorrect information from the Medicare Cost Report, false statements and false claims for reimbursement are made to Medicaid. Each false claim submitted to Medicare and/or Medicaid would constitute a violation of the False Claims Act.

78.     Medicaid providers like Defendants are reimbursed for covered services based on their submission of an electronic or hard copy claim form called the CMS Form 1500 Health Insurance Claim Form.

79.     When submitting claims using the CMS 1500, Defendants and other providers certify, *inter alia*, that "this claim .. complies with "with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law)."

80.     In making payment decisions, the Medicaid program relies on providers to submit truthful and accurate certifications.

81.    Generally, once a provider submits CMS Form 1500 or its electronic equivalent to Medicaid, the claim is paid directly to the provider, in reliance on the provider's certifications.

82.    Each of the Defendants illegally sought and received reimbursement from the respective designated state Medicaid programs for the time period pertinent to this Complaint. Defendants knew they were falsely expressly certifying compliance with the Stark Law and the AKS in each claim for reimbursement for services referred by physicians to whom they were paying kickbacks, or to whom they were paying compensation that violated the Stark Law.

## IV.    TRICARE AND OTHER GOVERNMENT-FUNDED PROGRAMS

83.    In addition to Medicaid and Medicare, the federal government reimburses health care services under several other federal health care programs, including but not limited to TRICARE, CHAMPVA and the Federal Employees Health Benefit Program ("FEHBP").

84.    TRICARE, administered by the United States Department of Defense through the Defense Health Agency, is a health care program for individuals and dependents affiliated with the armed forces. It offers military families a choice of three options: TRICARE Prime, TRICARE Extra, and TRICARE Standard (formerly known as CHAMPUS (Civilian Health & Medical Program for Uniformed Services), a health care plan for military dependents and retirees).

85.    CHAMPVA, administered by the United States Department of Veteran Affairs, is a health care program for the families of veterans with a 100 percent service-connected disability.

86.    The FEHBP, administered by the United States Office of Personnel Management, provides health insurance for hundreds of thousands of federal employees, retirees, and survivors.

87.    Like Medicare, TRICARE and other federal health care benefit programs cover only medically necessary inpatient and outpatient care. TRICARE defines medically necessary care as services or supplies provided by a hospital, physician, and/or other provider for the

18

prevention, diagnosis, and treatment of an illness, when those services or supplies are determined to be consistent with the condition, illness, or injury; provided in accordance with approved and generally accepted medical or surgical practice; not primarily for the convenience of the patient, the physician, or other providers; and not exceeding (duration or intensity) the level of care, which is needed to provide safe, adequate and appropriate diagnosis and treatments. See 32 C.F.R. § 199.4(a)(1)(i) (2019) and applicable definitions at 32 C.F.R. § 199.2 (2019).

88.     As with Medicare, providers submit claims to TRICARE using the CMS 1500 or an electronic equivalent. Providers therefore make the same certifications in submitting claims to TRICARE as they do when submitting claims to Medicare.

89.     Because it is not feasible for the TRICARE program, or its contractors, to review medical records corresponding to each of the claims for payment it receives from providers, the program relies on providers to comply with TRICARE requirements and relies on providers to submit truthful and accurate certifications and claims.

90.     Defendants knew they were falsely expressly certifying compliance with the Stark Law and the AKS in each claim for reimbursement to TRICARE for services referred by physicians to whom they were paying kickbacks, or to whom they were paying compensation that violated the Stark Law.

## V.     THE STARK LAW

91.     Enacted as amendments to the Social Security Act, 42 U.S.C. § 1395nn, the Stark Law) prohibits a hospital (or other entity providing healthcare items or services) from submitting claims for payment to Medicare based on patients referred by physicians having a "financial relationship" (as defined in the statute) with the hospital. Such referrals are "prohibited referrals." 42 U.S.C. § 1395nn(a)(1).

92. The regulations implementing the Stark Law expressly require that any entity collecting payment for a healthcare service performed under a prohibited referral must refund on a timely basis all amounts paid for such services. 42 C.F.R. § 411.353.

93 The Stark Law establishes the clear rule that the government will not pay for items or services prescribed by physicians who have improper financial relationships with the providers that submit claims for payment to the Government for such referred items or services.

94. In enacting the Stark Law, Congress found that improper financial relationships between physicians and entities to which they refer patients can compromise the physician's professional judgment as to whether an item or service is medically necessary, safe, effective, or of good quality. Congress relied upon various academic studies consistently showing that physicians who had financial relationships with hospitals and other entities used more of those entities' services than similarly situated physicians who did not have financial relationships. The Stark Statute was designed specifically to reduce the loss suffered by the Medicare program due to increased or questionable utilization of services.

95. Congress enacted the Stark Law in two parts, commonly known as Stark I and Stark II. Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992, by physicians with a prohibited financial relationship with the clinical lab provider. *See* Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204.

96. In 1993, Congress in Stark II, extended the Stark Law to referrals for ten additional designated health services. *See* Omnibus Reconciliation Act of 1993, P.L. 103-66, § 13562, Social Security Act Amendments of 1994, P.L. 103-432, § 152.

97. As of January 1, 1995, via Stark II, the Stark Law applied to patient referrals by physicians with a prohibited financial relationship for the following "designated health services"

20

("DHS" or "Designated Health Services"): (1) inpatient and outpatient hospital services; (2) physical therapy; (3) occupational therapy; (4) radiology; (5) radiation therapy (services and supplies); (6) durable medical equipment and supplies; (7) parenteral and enteral nutrients, equipment, and supplies; (8) prosthetics, orthotics, and prosthetic devices and supplies; (9) outpatient prescription drugs; and (10) home health services. *See* 42 U.S.C. § 1395nn(h)(6).

98. In pertinent part, the Stark Statute provides:

**Prohibition of certain referrals**

    (1)   *In general.* Except as provided in subsection (b) of this section, if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then

        (A)   the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and

        (B)   the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn(a)(1).

99. "Financial relationship" includes a "compensation arrangement," which includes any arrangement involving any remuneration paid directly or indirectly to a referring physician. See 42 U.S.C. §§ 1395nn(h)(1)(A) and (h)(1)(B).

100. A direct compensation arrangement exists if remuneration passes between the referring physician (or a member of his or her immediate family) and the entity furnishing DHS without any intervening persons or entities. 42 C.F.R. § 411.354(c)(1)(i) (2019).

101. A physician is deemed to "stand in the shoes" of his or her physician organization and have a direct compensation arrangement with an entity furnishing DHS if—

(A) The only intervening entity between the physician and the entity furnishing DHS is his or her physician organization; and

(B) The physician has an ownership or investment interest in the physician organization.

42 C.F.R. § 411.354(c)(1)(ii) (2019).

102.     The Stark Law is a strict liability statute. Every financial relationship between a DHS provider and a physician must meet a Stark exception to be legal, without regard to intent of the parties in the financial relationship. Providers who knowingly submit claims to Government Health Care Programs in violation of the Stark Law may be found liable for violation of the FCA. A knowing violation of the Stark Law may also subject the billing entity to exclusion from participation in federal health care programs and civil monetary penalties. 42 U.S.C. §§ 1395nn(g)(3), 1320a-7a(a).

103.     The Stark Law and companion regulations contain exceptions for certain compensation arrangements. The exceptions operate as affirmative defenses to alleged violations of the Stark Law. Once it has been shown that a party submitting Medicare claims has a financial relationship with a referring physician, the defendant bears the burden of demonstrating that the relationship meets all the requirements of an applicable statutory or regulatory exception to the Stark Law. *See, e.g., United States ex rel. Drakeford v. Tuomey Healthcare Sys., Inc.*, 675 F.3d 394, 405 (4th Cir. 2012).

104.     If no Stark exception applies to a financial relationship between a DHS provider and a physician, then all referrals from the referring physician to the DHS entity are prohibited, and no claim from the DHS entity for federal reimbursement for DHS furnished pursuant to the prohibited referral is eligible for reimbursement.

105. The Stark Law also applies to claims for payment under Medicaid, and federal funds may not be used to pay for designated health services through a state Medicaid program, including NC and TN Medicaid. See 42 U.S.C. § 1396b(s).

106. Compliance with the Stark Law is material to Medicare's and Medicaid's payment decisions because payment of Stark-tainted claims is statutorily prohibited and the financial relationships with physicians present a risk to federal healthcare programs and program beneficiaries of questionable or improper utilization of designated health services. Medicare and Medicaid would not and could not legally pay for any designated health service provided in violation of the Stark Law. 42 U.S.C. § 1395nn(g)(1); 42 U.S.C. § 1396b(s).

107. Indeed, the regulations implementing the Stark Statute expressly require that any entity collecting payment for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353(d) (2019). Thus, any payments received by Erlanger for Stark-tainted claims are overpayments that must be refunded, but were not, in violation of FCA and State FCAs.

## VI. THE FEDERAL ANTI-KICKBACK STATUTE

108. The Federal Anti-Kickback Statute ("AKS") makes it a crime to knowingly and willfully offer, pay, solicit or receive any remuneration to induce a person:

> (A) to refer an individual to a person for the furnishing or to arrange for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program; or

> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program.

*See* 42 U.S.C. § 1320a-7b(b)(1) and (2).

23

109. The AKS "address[es] Congress' concern that health care decision-making can be unduly influenced by a profit motive." Medicare and Medicaid Programs; Physicians' Referrals to Health Care Entities With Which They Have Financial Relationships, 63 Fed. Reg. 1659, 1662 (Jan. 9, 1998).

110. For purposes of the AKS, the term "remuneration" encompasses any kickback, bribe, or rebate, direct or indirect, overt or covert, cash or in kind. 42 U.S.C. §1320a-7b(b)(1).

111. Any compensation arrangement between Erlanger and a physician or physician practice that constitutes a financial relationship under the Stark Law would also constitute "remuneration" as defined by the AKS, unless a safe harbor to the AKS applies.

112. Knowing and willful conduct is a necessary element of the AKS criminal offense. 42 U.S.C. § 1320a-7b(b)(1).

113. For the purposes of the AKS, an act is willful if "the act was committed voluntarily and purposely, with the specific intent to do something the law forbids, that is with a bad purpose, either to disobey or disregard the law." *United States v. Starks*, 157 F.3d 833, 837-8 (11th Cir. 1998).

114. The AKS covers any financial arrangement where one purpose of the remuneration, even if there are others, was to obtain money for the referral of services or to induce further referrals of services. *United States v. Mallory*, 988 F.3d 730, 741 (4th Cir. 2021).

115. A claim that includes items or services resulting from a violation of the AKS constitutes a false or fraudulent claim for purposes of the Federal False Claims Act. 42 U.S.C. § 1320a-7(b)(g).

116. Even without a criminal conviction, if the Secretary of HHS finds administratively that a provider has violated the AKS, the Secretary may exclude that provider from the Federal

24

health care programs for a discretionary period and may impose administrative sanctions of $50,000 per kickback violation. 42 U.S.C. § 1320a-7(b).

117. HHS has published safe harbor regulations that define conduct that is not subject to the AKS because such practices would be unlikely to result in fraud or abuse. *See* 42 C.F.R. §1001.952 (2019). The safe harbor regulations set forth specific conditions that, if met, assure entities involved of not being prosecuted or sanctioned for the arrangement qualifying for the safe harbor. However, safe harbor protection is only afforded to those arrangements that precisely meet all of the conditions set forth in the safe harbor.

118. AKS safe harbors are affirmative defenses, and the defendant carries the burden of proof at trial. *United States v. Norton*, 17 F. App'x 98, 102 (4th Cir. 2001); *United States v. Berkeley Heartlab, Inc.,* 225 F. Supp. 3d 487, 511 (D.S.C. 2016).

119. The interplay between the AKS and the Stark Law has been summarized as follows:

> Both the anti-kickback statute and [Stark] address Congress' concern that health care decisionmaking can be unduly influenced by a profit motive. When physicians have a financial incentive to refer, this incentive can affect utilization, patient choice, and competition. Physicians can overutilize by ordering items and services for patients that, absent a profit motive, they would not have ordered. A patient's choice can be affected when physicians steer patients to less convenient, lower quality, or more expensive providers of health care, just because the physicians are sharing profits with, or receiving remuneration from, the providers. And lastly, where referrals are controlled by those sharing profits or receiving remuneration, the medical marketplace suffers since new competitors can no longer win business with superior quality, service, or price. Although the purposes behind the anti-kickback statute and [Stark] are similar, it is important to analyze them separately. In other words, to operate lawfully under Medicare and Medicaid, one must comply with both statutes.

*Medicare and Medicaid Programs; Physicians' Referrals to Health Care Entities With Which They Have Financial Relationships*, 63 Fed. Reg. 1659, 1662 (Jan. 9, 1998).

120. Compliance with AKS is material to Government Payers' payment decisions because kickbacks are statutorily prohibited to protect the integrity of Government healthcare

programs and AKS-tainted claims are statutorily designated as false claims under FCA. *See* 42 U.S.C. § 1320a-7b(g); *United States v. Mallory*, 988 F.3d 730, 741 (4th Cir. 2021) ("A violation of the Anti-Kickback Statute thus automatically constitutes a false claim under the False Claims Act.").

## VII. DEFENDANTS' FRAUDULENT SCHEME

121. Erlanger knowingly submitted or caused to be submitted false claims to the Government in violation of the FCA and the State FCAs for services referred to Erlanger by specific employed and non-employed physicians to whom Erlanger was paying illegal compensation in violation of the Stark Law and/or the AKS. Relators have insider knowledge of Erlanger's physician compensation arrangements, the referral practices of the physicians at issue here, and Erlanger's financial reliance on billing Government payers for services referred to Erlanger by those physicians.

### A. <u>Employed Physicians</u>

122. Beginning in April 2013 when Erlanger hired Kevin Spiegel as its President and CEO, Erlanger moved to an aggressive strategy of employing more physicians for the express purpose of adding revenue to its hospitals through increased referrals. Erlanger targeted local physicians with an existing patient base and referring capabilities.

123. Then-CEO Spiegel told Relator Sullivan that he wanted Erlanger to employ more physicians to be able to pay them more money to induce referrals without running afoul of the AKS. Around the same time, CEO Spiegel systematically dismantled the individual detailed physician contract reviews done in an electronic system at Erlanger that had been established during the CIA to ensure compliance with the Stark Law and AKS. CEO Spiegel intended to make

26

the physician hiring process faster and to eliminate the detailed individual reviews that ensured compliance with the Stark Law and AKS.

124. Just prior to her being let go in the purported reduction in force in 2019, Relator Sullivan had discussed with the Erlanger Board of Trustees' Audit and Compliance Committee completing a full review of employed physician compensation at Erlanger and she understood it was going to be conducted. At a later date, this project was included in the CEO's performance evaluation plan as defined by the Management and Board Evaluation Committee of the Erlanger Board of Trustees. Relator Sullivan is now informed that this physician compensation review was replaced with a payor reimbursement related project at the request of CEO Will Jackson with the agreement by the chairwoman of Erlanger's Board of Trustees, without the knowledge or consent of many of the other members of the Board of Trustee's Audit and Compliance Committee.

125. Prior to 2013, Erlanger employed only a handful of primary care physicians, pediatric physicians, and a few specialists. To capture more physician referrals and grow its market share, since 2013, Erlanger has hired hundreds of physicians in a division known as "Erlanger Medical Group." Erlanger Medical Group became Tennessee's fastest growing physician group and grew to now comprise more than 400 employed physicians from virtually every medical specialty. Erlanger's goal was to achieve a 50% market share by hiring physicians.

126. Because Erlanger's goal in hiring is to capture referrals, Erlanger's physician hiring decisions all turn on the creation and analysis of a financial pro forma generated by Erlanger's business support department. The pro formas list all revenues, including expected referrals from the prospective employee physician that would generate hospital facility fees from both inpatient and outpatient hospital services (designated health services) at Erlanger hospitals.

27

127.    Erlanger successfully recruited hundreds of physicians by offering and paying total compensation that was significantly higher than what the physicians were previously receiving prior to employment by Erlanger and well above fair market value. Erlanger designed and quantified each employed physician's compensation package by taking into account the financial pro forma created for him or her that included referrals that generate hospital facility fees for inpatient and outpatient hospital services at Erlanger. Erlanger documented compliance with fair market value based only on the employed physician's base compensation, and Erlanger had no systematic process to review total compensation which included the physician's incentive compensation. Relators, the Chief Compliance Officer and the Chief Financial Officer, raised concerns regarding this flawed process for reviewing fair market value in the physician contract committee meetings.

128.    Erlanger knew that designing and quantifying physician compensation in this manner, *i.e,* that took into account the volume or value of referrals to its hospitals, violated the Stark Law. For example, Erlanger decided to stop attaching these physician pro formas to the agenda of the physician contract committee meetings at which the physician hiring and/or salaries and incentives are to be discussed because Erlanger knew the pro formas demonstrate that Erlanger hires and designs physician compensation based on the value or volume of referrals from them, in violation of the Stark Law. Erlanger knowingly submitted claims to Medicare and Medicaid for designated health services referred by these physicians in direct violation of the Stark Law, the FCA and the State FCAs.

129.    Erlanger also closely accounted for and monitored the "Contribution Margin" of each employed and non-employed physician with privileges at Erlanger. This Contribution Margin included revenues from both physician professional fees and hospital facility fees resulting

28

from referrals from each respective physician and showed exactly whether and how each physician's referrals each year contributed or failed to contribute to Erlanger's financial bottom line. Erlanger used the Contribution Margin reports to improperly adjust physician compensation after recruitment in a manner that took into account the volume or value of actual referrals that generate hospital facility fees for inpatient and outpatient hospital services by each respective physician.

130. For example, in April 2015, Erlanger hired eight neurosurgeons from a private practice that had existed in the region for more than 50 years, Chattanooga Neurosurgery & Spine Clinic. The neurosurgeons who joined Erlanger as employees were Dr. Peter Boehm, Sr., Dr. Peter Boehm, Jr., Dr. Michael Gallagher, Dr. Paul Hoffman, Dr. Daniel Kueter, Dr. Lee Kern, Dr. Phil Megison and Dr. Timothy Strait. After evaluating the expected volume and value of their referrals, Erlanger offered and paid these neurosurgeons total compensation that was in excess of fair market value, determined in a manner that took into account referrals of designated health services, and which amounted to substantially more money than the physicians could make in private practice.

131. By 2018, Dr. Peter Boehm, Jr. and Dr. Daniel Kueter were among the leaders in Contribution Margin for Erlanger employed physicians, responsible for $2,044,380 and $1,936,796 respectively in Contribution Margin to Erlanger for calendar year 2018. These large Contribution Margin amounts reflect the lucrative reimbursement that Erlanger received for inpatient and outpatient hospital services (designated health services) in connection with neurosurgery procedures referred to Erlanger by these physicians. Erlanger rewarded each of these physicians with total compensation exceeding $1 million each that was in excess of fair market value and determined in a manner that took into account the volume or value of referrals of designated health services in violation of the Stark Law.

29

132. Erlanger thereby violated the FCA and the State FCAs each time it billed the Government for services referred by these physicians (Dr. Boehm, Jr. and Dr. Kueter) who Erlanger was compensating in violation of the Stark Law.

133. As another example, in 2016, Erlanger recruited and hired Dr. Harish Manyam from University Hospitals Case Western Reserve where he was a practicing cardiologist and an Assistant Professor of Medicine. Dr. Manyam presently serves as Erlanger's Chief of Cardiology and provides cardiac consultations on rotating Fridays at Murphy Medical Center, Inc. d/b/a/Erlanger Western Carolina Hospital. After evaluating the expected volume and value of his referrals, Erlanger offered and paid Dr. Manyam total compensation in excess of fair market value and which was determined in a manner that took into account his referrals of designated health services.

134. By 2018, Dr. Harish Manyam was among the leaders in Contribution Margin for Erlanger employed physicians, responsible for $2,158,763 in Contribution Margin for calendar year 2018 alone. This large Contribution Margin amount reflects the lucrative reimbursement that Erlanger received for inpatient and outpatient hospital services (designated health services) in connection with cardiology procedures referred to Erlanger by Dr. Manyam. Erlanger rewarded Dr. Manyam with total compensation exceeding $1 million that was in excess of fair market value and determined in a manner that took into account the volume or value of referrals of designated health services, in violation of the Stark Law.

135. Erlanger knowingly submitted claims to Medicare and Medicaid for designated health services referred by Dr. Manyam and falsely certified compliance with the Stark Law, in direct violation of the FCA and the State FCAs.

30

136.     As another example. in November 2016, Erlanger recruited and hired Dr. Larry Shears, a cardiothoracic surgeon from Wellspan Health in York, Pennsylvania.  After evaluating the expected volume and value of his referrals, Erlanger offered and paid Dr. Shears total compensation in excess of fair market value and which was determined in a manner that took into his account referrals of designated health services.

137.     By 2018, Dr. Larry Shears had the highest Contribution Margin for all employed and non-employed physicians practicing at Erlanger, responsible for $9,503,980 in Contribution Margin for calendar year 2018.  This huge Contribution Margin amount reflects the lucrative reimbursement that Erlanger received for inpatient and outpatient hospital services (designated health services) in connection with cardiothoracic procedures referred to Erlanger by Dr. Shears. Erlanger rewarded Dr. Shears with total compensation exceeding $1 million that was in excess of fair market value and determined in a manner that took into account the volume or value of referrals of designated health services, in violation of the Stark Law.

138.     Erlanger knowingly submitted claims to Medicare and Medicaid for designated health services referred by Dr. Shears in direct violation of the FCA and the State FCAs.

139.     Erlanger's valuation of referrals from surgeons even trumps patient safety as evidenced by Erlanger's baldly looking the other way in the face of many complaints about the quality of Dr. Shears' cardiac surgeries.  Erlanger knew that Dr. Shears' surgery patients had twice the national standard of dying due to their surgeries but took no action to report this fact or restrict his surgeries at Erlanger.  Further, Erlanger knew that Dr. Shears had on at least two occasions refused to take bleeding patients back into surgery to stop their bleeding because to do so would mar his record, so he transfused those patients with so much blood over a period of hours that he severely depleted the blood supply in the entire Chattanooga area.  Erlanger received numerous

complaints from other surgeons and medical personnel about Dr. Shears doing unnecessary cardiac surgeries and doing poor quality surgeries, but looked the other way due to the value of his referred surgeries to Erlanger's bottom line.

140.    Similarly, Erlanger took only minimal action against a neurosurgeon, Dr. Keuter, who allowed his teenage daughter to place screws in a surgery patient in an Erlanger operating room during a surgery. Erlanger only put Dr. Keuter on a 3-month leave of absence. Erlanger valued his referred surgical services over such dangerous and unprofessional conduct.

### 1.    wRVU Incentive Payments

141.    One of the ways Erlanger paid excessive compensation to its employed physicians was through incentives based on work Relative Value Units ("wRVUs"). wRVUs represent the relative amount of physician work, resources and expertise necessary to provide a specific service to a patient and serve as a productivity metric for work personally performed by physicians.

142.    To incentivize high-referring physicians, Erlanger paid more for their wRVUs than it paid to physicians with lower Contribution Margins. Erlanger used each physician's pro forma (that included referrals generating hospital facility fees for inpatient and outpatient hospital services) and the physician's Contribution Margin and then offered and paid more for each wRVU of a physician whose referrals were more valuable to Erlanger. Erlanger simply concealed the unlawful nature of its incentive payments to physicians by saying they were based on wRVUs, but in reality, the physician's compensation simply took into account the volume and value of his or her referrals to Erlanger, in violation of the Stark Law.

143.    Erlanger devised an unusual and perverse escalating valuation scale whereby the amount paid per wRVU steeply increased as a physician's annual total number of wRVUs

32

increased. Erlanger ignored this incentive compensation in evaluating whether the physician's compensation was consistent with fair market value in compliance with the Stark Law.

144.    For example, Erlanger offered the following wRVU-based incentive to one of its employed physicians in an employment contract:

> If Physician generates at least 7,471 wRVUs annually, a Productivity Incentive will be paid to Physician equal to a dollar amount calculated based on the number of wRVUs generated by Physician for services personally performed by Physician (as such term is defined under the Stark Law) as follows:
>
> 1.    $50.75 per wRVU for each wRVU generated from 7,471 to 10,121.
>
> 2.    $89.75 per wRVU for each wRVU generated from 10,122 to 11,625.
>
> 3.    $158.50 per wRVU for each wRVU generated in excess of 11,625.

145.    $158.50 per wRVU is far in excess of fair market value for any physician specialty. According to the 2017 MGMA Survey for Surgery, commonly relied on as offering the market value of physicians by practice area: for example, a Neurological surgeon being paid $108.03 per wRVU places that surgeon in the 75th percentile of all such specialists.

146.    This method of calculating incentive payments created and used by Erlanger resulted in improper and excessive payments to employed physicians that were above fair market value and not commercially reasonable in the absence of referrals. In a normal arm's length transaction, the price paid per wRVU should decrease as the number of wRVUs for each physician increases because fixed costs remain the same and only marginal costs change.

### 2.    Indirect Payments Through UT COM

147.    Another way that Erlanger secretly provided excessive total compensation to its high-referring employed physicians was by paying to the University of Tennessee College of

Medicine ("UT COM") funds to be paid to physicians referring to Erlanger purportedly for the supervision of UT COM residents. Erlanger specifically instructed UT COM how much to pay to specific physicians, as set forth in spreadsheets approved by Erlanger. This compensation was treated by Erlanger, wrongly, as compensation paid by UT COM and not by Erlanger, in an effort to hide the gross violation of the Stark Law.

148. For fiscal year ended June 30, 2020, Erlanger paid UT COM to pass on to certain of Erlanger's highly compensated physicians amounts purportedly for supervision, ranging from $50,000 to over $200,000 per physician. Physicians who received these supervision payments from UT COM, in addition to their employment compensation from Erlanger, included Dr. Peter Boehm, Jr., Dr. Daniel Kueter, Dr. Joseph Miller, Dr. Prayash Patel, Dr. Jeremy Bruce, Dr. William Bruce, Dr. Jesse Doty, Dr. Mark Freeman, Dr. Amar Singh, and Dr. Stephen DePasquale. Prior to fiscal year ended June 30, 2020, Erlanger paid UT COM for pass-through supervision payments to Dr. Richard Alvarez.

149. The combination of employment compensation paid directly by Erlanger (including escalating wRVU incentives), plus the specific supervision payments paid by Erlanger and passed through to physicians by UT COM, resulted in the total compensation of these physicians exceeding fair market value and the total compensation was determined in a manner that took into account the volume and value of referrals of designated health services, in violation of the Stark Law. When Erlanger billed Medicare and Medicaid for services referred by these physicians, it was knowingly submitting false claims under the FCA and the State FCAs.

### 3. Relators Expressed Compliance Concerns but Nothing Changed

150. On January 30, 2017, Relator Sullivan in her capacity as Chief Compliance Officer of Erlanger received a compliance concern from an Erlanger Director that the large incentive pay

34

of a specific employed physician, Dr. Jesse Doty, could take Erlanger's compensation to Dr. Doty beyond the range of fair market value and commercial reasonableness and into violating the Stark Law.

151. Relator Sullivan gathered Erlanger's wRVU information on Dr. Doty, which reflected that Dr. Doty was being paid for annual wRVUs in excess of 20,000. This is an extraordinary amount of wRVU compensation. The average wRVUs for Orthopedic Surgery: General in the United States in 2016 was 8,087 wRVUs, according to MGMA Physician Compensation & Production data.

152. Indeed, Erlanger's CEO, William Jackson, MD, along with the Senior Vice President of Physician Services, Meridith O'Keefe affirmatively blocked Relator Sullivan's efforts to investigate physician compensation compliance issues and its chief legal officer, Jeffrey Woodard, controlled the Compliance department's access to outside legal counsel and forbade her from talking to Erlanger's outside legal counsel about physician compensation issues. Ms. Sullivan persevered and repeatedly requested a private meeting with the Audit and Compliance Committee of the Erlanger Board of Trustees to discuss her concerns about Erlanger paying physicians in violation of the Stark Law and the AKS, but that meeting was never scheduled, to the best of Ms. Sullivan's knowledge, because CEO Jackson did not want that meeting to happen.

153. Despite the concerns raised about Dr. Doty's compensation, the compliance concern languished, and Erlanger took no corrective action.

154. Due to Erlanger's escalating wRVU incentive bonus structure, Erlanger was paying Dr. Doty total compensation in excess of $2 million per year. Erlanger obtained a fair market value review in 2020/2021 timeframe that found Dr. Doty was the highest paid orthopedic ankle physician in the nation.

35

155. Relator Tabor raised concerns about the UT COM pass-through payments to Erlanger employed physicians, specifically including Dr. Doty, on many occasions during physician compensation committee meetings. However, Erlanger took no corrective action.

156. Relators raised and discussed concerns about the wRVU incentive compensation model on multiple occasions at the Audit and Compliance Committee of Erlanger's Board of Trustees. The concern was so heightened that the Board mandated that a third party come in and review total compensation of all employed physicians as part of the CEO evaluation metrics for the 2021 fiscal year. However, the CEO was strongly opposed to the more thorough review and convinced the Chairwoman of the Board to allow him to substitute a payer rates strategy project for this evaluation metric. Thus, the wRVU payment scheme went unaudited. Several Board members were not happy with this decision due to mounting losses of the physician practices.

### 4. Erlanger Knowingly Submitted False Claims on Referrals Prohibited by the Stark Law

157. Erlanger paid certain of its employed physicians in ways that resulted in their total compensation exceeding fair market value, being commercially unreasonable in the absence of referrals, and being determined in a manner that took into account the volume and value of referrals of designated health services, all in violation of the Stark Law. As such, Erlanger could not reasonably have concluded that the financial arrangements with certain of its employed physicians did not violate the Stark Law. Erlanger knew it was in violation of the Stark Law and yet still knowingly made the excessive payments to certain employed physicians and knowingly submitted tainted illegal claims for reimbursement to Medicare and Medicaid in violation of the Stark Law, FCA and State FCAs.

158. Based on the contractual and actual financial relationships among Erlanger, UT COM and certain of Erlanger's employed physicians, the Stark Law was violated because Erlanger

Case 1:25-cv-00155-CLC-CHS     Document 2     Filed 08/12/21     Page 36 of 58     PageID #: 42

had direct and improper compensation arrangements with certain of its employed physicians and none of the statutory or regulatory exceptions to the Stark Law apply to those arrangements.

159.     Erlanger knowingly made false statements about its compliance with the Stark Law to Government Payers with respect to certain of its employed physicians.  Erlanger knowingly concealed, avoided or decreased an obligation to pay or transmit money to the United States relating to tainted illegal claims for reimbursement submitted to Medicare and Medicaid in violation of the Stark Law, FCA and State FCAs.

### 5.     Indicia of Reliability and Examples of False Claims

160.     Based on Relators' direct and extensive knowledge of Erlanger's billing processes gained during their long tenures as Chief Compliance Officer and Chief Financial Officer, Relators have direct and personal knowledge that Erlanger knowingly billed Government Payers tens of millions of dollars for designated health services (including inpatient and outpatient hospital services and procedures) referred by certain employed physicians whose total compensation exceeded fair market value, was commercially unreasonable in the absence of referrals, and was determined in a manner that took into account referrals of designated health services in violation of the Stark Law. 42 U.S.C. § 1395nn(a)(1)(B).  All these claims are false claims under the FCA.

161.     **Representative False Claim #1** – Between November 30 and December 13, 2017, Dr. Larry Shears, an Erlanger employed physician whose Stark-violative compensation is described above at ¶¶ 125-127, referred "Patient #1" for inpatient hospital services at Erlanger Baroness Hospital.[1] Relators have direct knowledge that Erlanger submitted electronic claims for

_____

[1] Relators provided actual patient names to the United States, State of North Carolina and State of Tennessee in its voluntary disclosures prior to the filing of this lawsuit.

37

those hospital inpatient services to Medicare for Patient #1. Those claims were false claims under the FCA.

162. **Representative False Claim #2** - Between December 6 and December 9, 2017, Dr. Larry Shears referred "Patient #2" for inpatient hospital services at Erlanger Baroness Hospital. Relators have direct knowledge that Erlanger submitted electronic claims for the hospital inpatient services to Medicare for Patient #2. Those claims were false claims under the FCA.

163. **Representative False Claim #3** - Between January 3 and February 15, 2018, Dr. Larry Shears referred Patient Number #3 for inpatient hospital services at Erlanger Baroness Hospital. Relators have direct knowledge that Erlanger submitted electronic claims for the hospital inpatient services provided to Medicare for Patient #3. Those claims were false claims under the FCA.

164. **Representative False Claim #4** - Between March 1 and March 3, 2021, Dr. Daniel Kueter, an employed physician whose Stark-violative compensation is described above at ¶¶ 119-121, referred Patient Number #4 for inpatient hospital services at Erlanger Baroness Hospital. Relators have direct knowledge that Erlanger submitted electronic claims for the hospital inpatient services provided to Medicare for Patient #4. Those claims were false claims under the FCA.

165. **Representative False Claim #5** - Between November 5 and November 26, 2017, Dr. Larry Shears referred Patient Number #5 for inpatient hospital services at Erlanger Baroness Hospital. Relators have direct knowledge that Erlanger submitted electronic claims for the hospital inpatient services provided to BlueCare Tennessee Medicaid for Patient #5. Those claims were false claims under the FCA.

166. **Representative False Claim #6** - Between January 6 and January 15, 2018, Dr. Larry Shears referred Patient Number #6 for inpatient hospital services at Erlanger Baroness

Hospital. Relators have direct knowledge that Erlanger submitted electronic claims for the hospital inpatient services provided to Amerigroup Tennessee Medicaid for Patient #6. Those claims were false claims under the FCA.

### B.    University Surgical Associates, P.C. (Physicians not employed by Erlanger)

167.    In addition to its fraudulent scheme involving employed physicians, Erlanger offered and paid remuneration in a variety of ways (detailed below) to induce referrals from physicians it did not employ and who held ownership interests in University Surgical Associates, P.C. ("USA PC"), a large independent physician surgery group based in Chattanooga. Each of the USA PC shareholder physicians at issue in this case were at all relevant times owners of USA PC and are referred to herein as "USA PC Physicians."

168.    The remuneration that Erlanger paid to induce referrals from USA PC constitutes kickbacks prohibited by the AKS. Erlanger knowingly submitted false claims to Government Payers for kickback-tainted referrals in violation of the FCA and the State FCAs.

169.    In addition to violating the AKS, Erlanger's financial relationships with the USA PC Physicians violated the Stark Law. Those financial relationships were "direct compensation arrangements" under the Stark Law because each USA PC Physician "stands in the shoes" of his or her physician organization/USA PC. 42 C.F.R. § 411.354(c)(1)(ii) (2019).

170.    Erlanger's financial relationships with USA PC and its owner-physicians were direct compensation arrangements that exceeded fair market value, were commercially unreasonable in the absence of referrals, and that were determined in a manner that took into account the volume or value of designated health services, in violation of the Stark Law.

### 1.     Payments Through UT COM

171.     One component of the kickbacks and Stark violative excessive compensation that Erlanger paid to the USA PC Physicians was its provision of funding to the University of Tennessee College of Medicine ("UT COM") purportedly for the supervision of residents. Erlanger paid to UT COM funds with instructions on how much to pay to specific USA PC physicians as detailed for UT COM in spreadsheets approved by Erlanger.

172.     For fiscal year ended June 30, 2020, Erlanger paid, and UT COM passed through to certain of USA PC's owner-physicians, money purportedly for supervision, ranging from $25,000 to over $200,000 per physician.  USA PC owner-physicians who received these pass-through payments from Erlanger include Dr. Coleman Arnold, Dr. R. Phillip Burns, Dr. Benjamin Dart, Dr. Daniel Fisher, Dr. Michael Greer, Dr. Robert Moore, Dr. Philip Smith and Dr. J. Daniel Stanley.

173.     Dr. R. Phillip Burns is the managerial head of USA PC, a member of the board of trustees of Erlanger, is the dean of UT COM and holds a chairmanship of the surgery department at UT COM.

174.     One purpose of Erlanger funding and directing UT COM to pay these USA PC physicians for supervision was to induce referrals to Erlanger hospitals, in violation of the AKS.

### 2.     Direct Payments for Call Coverage and Medical Director Services

175.     Erlanger paid USA PC for its physicians to provide specialty trauma call coverage services pursuant to numerous contracts.  The contracts required the call physician to come to the hospital to care for patients.  According to an Erlanger Compliance review, some of the USA PC call coverage physicians refused to present at the hospital and deferred the patient care until the next day.  Erlanger knew this but paid for the nonexistent call coverage anyway as a means of

40

remunerating high referring USA PC physicians in violation of the AKS. In addition, the call coverage payments exceeded the fair market value of the call coverage services actually provided, in violation of the Stark Law.

176. Erlanger paid USA PC purportedly for certain of its physicians to provide medical director services to Erlanger. The medical director payments were made to induce referrals from USA PC physicians to Erlanger and thus violated the AKS. Erlanger created more medical directorships for USA PC physicians than needed in order funnel more money to the physicians. In addition, the medical director payments exceeded the fair market value of the medical director services actually provided, in violation of the Stark Law.

### 3. Free Nurse Practitioners

177. Prior to 2010, Erlanger also paid USA PC for four nurse practitioners via the UT COM pass-through scheme. Erlanger paid UT COM and UT COM paid for the USA PC nurse practitioners. After the 2010/2011 timeframe of this arrangement, the nurse practitioner line item was removed from the UT COM spreadsheet to hide it and the exact amount of that line item was divided among individual faculty salaries of USA PC physicians who referred to Erlanger. One purpose of Erlanger providing free nurse practitioners to USA PC was to induce referrals from USA PC and its physicians, in violation of the AKS.

### 4. Erlanger paid USA PC Physicians Via Free and Greatly Reduced Cost IT Support Services

178. Erlanger remunerated USA PC and its physicians by providing at no cost or at greatly reduced cost (in any case, far less than fair market value) IT support services at USA PC physicians' medical offices. When this illegal remuneration came to light within Erlanger management, Erlanger executed a minimal settlement with USA PC and its physicians that did not pay Erlanger back for anywhere near the full fair market value of the IT support services that

41

Erlanger had been providing. In fact, Erlanger internally valued the IT services at hundreds of thousands of dollars more than it was charging USA PC physicians for the services. And the remuneration continued: The contract that was eventually created to document Erlanger's provision of the IT support services did not require payment by USA PC for the services at their fair market value. One purpose of Erlanger providing free or below fair market value IT support services was to induce referrals from USA PC and its physicians, in violation of the AKS.

179. Erlanger intentionally violated the AKS and knowingly submitted false claims to Government Payers for services referred by USA PC and its physicians to whom Erlanger paid kickbacks. Erlanger knowingly remunerated USA PC and its physicians with a combination of kickbacks, including indirect supervision payments through UT COM, direct payments for call coverage and medical director services, free physician assistants, free rent and free or below fair market value technology services. One purpose of this combination of various remuneration schemes was to induce referrals from USA PC and its physicians to Erlanger.

180. The UT COM pass-through payments combined with the other components of remuneration paid by Erlanger to USA PC, resulted in total compensation that exceeded fair market value, was commercially unreasonable in the absence of referrals, and that was determined in a manner that took into account the volume and value of referrals of designated health services, in violation of the Stark Law.

181. Erlanger violated the Stark Law and knowingly submitted false claims for designated health services referred to it by USA PC Physicians with whom Erlanger had Stark-violative financial relationships. As set forth above, through UT COM, Erlanger paid for clinical services never rendered by USA PC Physicians; paid excessive amounts for call coverage and medical director services; provided free and/or below fair market value IT support services to USA

42

PC Physicians, all in violation of the Stark Law. Erlanger could not reasonably have concluded that the combination of compensation benefiting USA PC and its physicians did not violate the Stark Law. Erlanger knew it was in violation of the Stark Law and yet still knowingly submitted tainted, illegal claims for reimbursement to Medicare and Medicaid for prohibited referrals from those physicians in violation of the Stark Law, the FCA and the State FCAs.

182.    USA PC and its owner-physicians had direct compensation arrangements with Erlanger, and none of the statutory or regulatory exceptions to the Stark Statute apply to those arrangements. Each of the compensation arrangements directly with USA PC was a direct improper compensation arrangement under the Stark Law because the USA PC Physicians (the referring physicians) each stand in the shoes of USA PC (their physician organization) due to their ownership interests in USA PC as shareholders, and Erlanger (the entity furnishing DHS) paid them directly without an intervening person or entity. 42 C.F.R. § 411.354(c)(1)(i) and (ii) (2019).

183.    The compensation arrangement whereby Erlanger paid for clinical services never rendered by USA PC physicians through UT COM is an "indirect compensation arrangement" under the Stark Law because (i) an unbroken chain of compensation arrangements exist between the USA PC physicians (the referring physicians) and Erlanger (the entity furnishing DHS); (ii) USA PC and its owner-physicians receive aggregate compensation from UT COM that was determined in a manner that took into account the volume or value of referrals; and (iii) Erlanger had actual knowledge, or acted in reckless disregard or deliberate ignorance of the fact that the USA PC physicians receive aggregate compensation that was determined in a manner that took into account the volume or value of referrals. 42 C.F.R. § 411.354(c)(2)(i), (ii), and (iii) (2019).

### 5.    Erlanger Knowingly Submitted False Claims on Referrals Prohibited by AKS and the Stark Law

184. Erlanger knew it was in violation of the AKS and knowingly continued to submit tainted, ineligible claims for reimbursement to Government Payers with false express certifications of compliance with the AKS for services referred from USA PC and its Physicians in violation of the AKS, the FCA and the State FCAs.

185. Erlanger knew it was in violation of the AKS and the Stark Law and knowingly continued to submit tainted, ineligible claims for reimbursement to the Government Payers with false express certifications of compliance with the AKS and the Stark Law for services referred from USA PC and its Physicians in violation of the AKS, the Stark Law, the FCA and the State FCAs.

186. Erlanger knowingly made false statements about its compliance with the AKS and Stark Law to Government Payers given its payments to USA PC and its physicians.

187. Moreover, Erlanger knowingly concealed, avoided or decreased an obligation to repay the United States for those tainted ineligible paid claims, in violation of the FCA and the State FCAs.

**C.  Other Community Physicians (Physicians not Employed by Erlanger)**

188. In addition to its fraudulent schemes involving Erlanger-employed physicians and USA PC and its Physicians, Erlanger offered and paid remuneration through UT COM to certain community physicians in private practices who were not employed by Erlanger or USA PC. These community physicians include Dr. Larry Sargent, Dr. Mark Brzezienski, Dr. Suresh Enjeti and Dr. James Tumlin (the "Community Physicians").

189. Erlanger funneled money to the Community Physicians by providing funding to UT COM purportedly for clinical services, but the Community Physicians did not provide any

44

such clinical services to Erlanger. Erlanger instructed UT COM how much to pay to each Community Physician based on the value of his referrals to Erlanger.

190. With regard to the Community Physicians, Erlanger insisted that in order for a Community Physician to receive a chairmanship at UT COM with the concomitant compensation funded by Erlanger, such Physician must be willing to perform at least 70%-75% of his procedures at Erlanger's hospitals. Relator Tabor was present at a meeting in which Erlanger attempted to enforce this requirement against Community Physician, Dr. Mark Brzezienski, when Dr. Brzezienski's referrals to Erlanger hospitals were not meeting the 70%-75% requirement. At that meeting, attended by Erlanger's CEO Spiegel, Relator Tabor, and Dr. Brezinski, Erlanger insisted that to maintain his chairmanship at UT COM, Brezinski must perform fully 70%-75% of his procedures at Erlanger rather than at its competitor, CHI Memorial Hospital. Relator Tabor was also in attendance at a meeting attended by Erlanger's CEO Spiegel, Relator Tabor and the UT COM chancellor, Dr. Schwab, at which Dr. Schwab agreed with Erlanger's prohibition of a UT COM chairmanship unless the physician was willing to perform at least 70%-75% of his procedures at Erlanger.

191. Erlanger also paid the private group practices of the Community Physician amounts for trauma call coverage and medical director services purportedly provided to Erlanger.

192. One purpose of Erlanger funding the UT COM pass-through payments to the Community Physicians for clinical services was to induce referrals to Erlanger hospitals, in violation of the AKS.

193. The UT COM pass-through payments, combined with the other components of remuneration paid by Erlanger to the Community Physicians and their group practices, resulted in total compensation that exceeded fair market value, was commercially unreasonable in the absence

of referrals, and that was determined in a manner that took into account the volume and value of referrals of designated health services, in violation of the Stark Law.

194.     Erlanger intentionally violated the AKS and knowingly submitted false claims to Government Payers for services referred by the Community Physicians to whom Erlanger paid kickbacks. Erlanger knowingly remunerated the Community Physicians with a combination of kickbacks, including indirect pass-through payments through UT COM for clinical services never rendered, and direct payments for call coverage and medical director services. One purpose of this combination of various remuneration schemes was to induce referrals from the Community Physicians to Erlanger.

195.     Erlanger violated the Stark Law and knowingly submitted false claims for designated health services referred by physicians with whom Erlanger had Stark-violative financial relationships. As set forth above, through UT COM, Erlanger paid Community Physicians for clinical serves that were never provided and paid excessive amounts for call coverage and medical director services, in violation of the Stark Law. Erlanger could not reasonably have concluded that the combination of compensation benefiting the Community Physicians did not violate the Stark Law. Erlanger knew it was in violation of the Stark Law and yet still knowingly submitted tainted, illegal claims for reimbursement to Medicare and Medicaid for prohibited referrals from those physicians in violation of the Stark Law, the FCA and the State FCAs.

196.     Based on the financial relationships between the Community Physicians and Erlanger, the Stark Law was violated because the Community Physicians had direct compensation arrangements with Erlanger and none of the statutory or regulatory exceptions to the Stark Statute apply to those arrangements. Each of the compensation arrangements directly with the Community Physicians or their physician group practice was a direct and improper compensation

46

arrangement under the Stark Law because the Community Physicians (the referring physicians) each stand in the shoes of their physician organization due to their ownership interests in the physician organizations, and Erlanger (the entity furnishing DHS) paid them directly without an intervening person or entity. 42 C.F.R. § 411.354(c)(1)(i) and (ii) (2019).

197.    The compensation arrangement whereby Erlanger allegedly subsidized clinical services payments through UT COM is an "indirect compensation arrangement" under the Stark Law because (i) an unbroken chain of compensation arrangements exist between the Community Physicians (the referring physicians) and Erlanger (the entity furnishing DHS), (ii) the Community Physicians receive aggregate compensation from Erlanger via UT COM that was determined in a manner that took into account the volume or value of referrals, and (iii) Erlanger had actual knowledge, or acted in reckless disregard or deliberate ignorance of the fact that the Community Physicians receive aggregate compensation that was determined in a manner that took into account the volume or value of referrals. 42 C.F.R. § 411.354(c)(2)(i), (ii), and (iii) (2019).

198.    Erlanger knew it was in violation of the AKS and knowingly continued to submit tainted, ineligible claims for reimbursement to Government Payers with false express certifications of compliance with the AKS for services referred from the Community Physicians in violation of the AKS, the FCA and the State FCAs.

199.    Erlanger knew it was in violation of the Stark Law and knowingly continued to submit tainted, ineligible claims for reimbursement to the Government Payers with false express certifications of compliance with the Stark Law for services for services referred from the Community Physicians in violation of the Stark Law, the FCA and the State FCAs.

47

200. Erlanger knowingly made false statements about its compliance with the AKS and Stark Law to Government Payers with respect to its payments to the Community Physicians.

201. Erlanger knowingly concealed, avoided or decreased an obligation to pay or transmit money to the United States relating to those tainted ineligible claims for reimbursement submitted to Government Payers, in violation of the FCA and the State FCAs.

### D. Erlanger Billed the Government for Patient Tests Even Though No One Read the Results or Used them in Patient Care

202. In 2019, Erlanger's then-chief information officer, Dr. Steve Adams, discovered that over an approximate 2-year period of time, Erlanger had conducted and billed to insurers, including Government Payers, fully 14,000 tests (radiology and laboratory tests) on patients whose test results were not read by the treating physician. More specifically, 4,000 of the 14,000 test results files had never been opened by anyone as evidenced by Dr. Adams' review of the files in in Erlanger's electronic medical record system, "Epic." The other 8,000 test results files had been opened by someone but there were no comments or signatures of review by any treating physician as would normally be seen if a test result had been reviewed.

203. Medicare will only reimburse for tests that are medically necessary. When test results are not used by the treating physician to treat the patient, the tests are not eligible for reimbursement. Some of the unread test results showed serious diagnoses, even including cancer. Dr. Adams, himself, had to contact a patient with that late diagnosis. In response to Dr. Adams' compliance alert on these 14,000 test results, Erlanger took the position internally that if a test result file had been opened, even without the required signs of review by the treating physician, the tests were eligible for reimbursement. Erlanger did not refund Government Payers for the payments it had received for those 8,000 test claims, or for the 4,000 tests for which the results files were never opened.

48

## VIII. MATERIALITY

204. Defendants' violation of the Stark Law and its false certification of compliance with that law were material to Medicare's and Medicaid's decisions to pay the false claims at issue in this case. Payment of claims resulting from referrals from physicians who are being compensated in violation of the Stark Law is expressly prohibited by statute. 42 U.S.C. § 1395nn(g)(1); 42 U.S.C. § 1396b(s). Medicare and Medicaid could not have lawfully paid Erlanger's false claims had it known of the violations of the Stark Law because such payment is statutorily prohibited. *Id.* As a result, Erlanger's violations of the Stark Law are material to Medicare's and Medicaid's decisions to pay Erlanger's false claims.

205. Defendants' intentional violation of the AKS and its false certification of compliance with that law were material to the Government Payer's payment decisions. As widely recognized by courts across the United States, violations of the AKS are material to the Government's payment decisions because claims for reimbursement for services resulting from a violation of the AKS are false and fraudulent by statute. 42 U.S.C. § 1320a-7b(g).

206. Defendants' knowing failure to refund payments for tests done but not reviewed by the treating provider was material to Government Payers because Government Payers are forbidden from paying for services that are not medically necessary, including tests performed but the results not reviewed by the treating physician.

## LEGAL CLAIMS FOR RELIEF

### COUNT ONE
(False Claims Act: Presentation of False Claims)
(31 U.S.C. § 3729(a)(1)(A))

207.   All paragraphs of this Complaint set out above are hereby incorporated into Count One as if fully set forth herein.

208.   Each of the Defendants presented or caused to be presented false or fraudulent claims for payment to federally-funded health insurance programs in violation of, *inter alia*, 31 U.S.C. § 3729(a)(1)(A).

209.   Said claims were presented by each of the respective Defendants with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of the truth or the falsity of the information.

210.   The false claims presented by Defendants were material to the United States' payment decisions on the claims and said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

211.   As a result of the Defendants' fraudulent conduct, the United States has been damaged in amounts to be determined at trial.

212.   Additionally, the United States is entitled to penalties of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, for each false claim, plus 3 times the amount of damages which the Government sustains because of the act of that person, together with all other relief allowed by law.

### COUNT TWO
(False Claims Act: Using False Statements to Cause False Claims to Be Paid)
(31 U.S.C. § 3729(a)(1)(B))

213. All paragraphs of this Complaint set out above are hereby incorporated into Count Two as if fully set forth herein.

214. Each of the Defendants made, used, caused to be made, or caused to be used false or fraudulent records and statements to get false or fraudulent claims paid or approved in violation of, *inter alia*, 31 U.S.C. § 3729(a)(1)(B).

215. The false or fraudulent certifications and representations made and caused to be made by each of the Defendants were material to the United States' payment of the false claims.

216. Said false or fraudulent records and statements were made or caused to be made by each of the respective Defendants with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of the truth or the falsity of the information.

217. As a result of the Defendants' fraudulent conduct, the United States has been damaged in amounts to be determined at trial.

218. Additionally, the United States is entitled to penalties of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, for each false claim, plus 3 times the amount of damages which the Government sustains because of the act of that person, together with all other relief allowed by law.

## COUNT THREE
(False Claims Act: Using a False Record Material to Obligation to Pay)
(31 U.S.C. § 3729(a)(1)(G))

219. All paragraphs of this Complaint set out above are hereby incorporated into Count Three as if fully set forth herein.

220. Each of the Defendants made, used, caused to be made, or caused to be used false or fraudulent records and statements material to an obligation to pay or transmit money to the

51

United States, or concealed, avoided or decreased an obligation to pay or transmit money to the United States in violation of, *inter alia*, 31 U.S.C. § 3729(a)(1)(G).

221.  The false or fraudulent certifications and representations made and caused to be made by each of the Defendants were material to the United States' payment of the false claims.

222.  Said false or fraudulent records and statements were made or caused to be made by each of the respective Defendants with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of the truth or the falsity of the information.

223.  As a result of the Defendants' fraudulent conduct, the United States has been damaged in amounts to be determined at trial.

224.  Additionally, the United States is entitled to penalties of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, for each false claim, plus 3 times the amount of damages which the Government sustains because of the act of that person, together with all other relief allowed by law.

## COUNT FOUR
### NORTH CAROLINA FALSE CLAIMS ACT
(N.C. Gen. Stat. § 1-605, et. seq.)

225.  All paragraphs of this Complaint set out above are hereby incorporated into Count Four as if fully set forth herein.

226.  This Count is brought by Relators in the name of the State of North Carolina under the *qui tam* provisions of the North Carolina False Claims Act, N.C. Gen. Stat §§ 1-605 *et seq*.

227.  By virtue of the above-described acts, Defendants knowingly presented or caused to be presented to the State of North Carolina false or fraudulent claims for payment or approval, in violation of N.C. Gen Stat. §1-607(a)(1).

228. By virtue of the above-described acts, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claims paid, in violation of N.C. Gen Stat. §1-607(a)(2).

229. By virtue of the above-described acts, among other things, Defendants knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the State of North Carolina, or knowingly concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State, in violation of N.C. Gen Stat. §1-607(a)(7).

230. As a result of the Defendants' fraudulent conduct, the State of North Carolina has been damaged in amounts to be determined at trial.

231. Additionally, the State of North Carolina is entitled to a civil penalty of not less than five thousand five hundred dollars ($5,500) and not more than eleven thousand dollars ($11,000), as may be adjusted by Section 5 of the Federal Civil Penalties Inflation Adjustment Act of 1990, for each false claim, plus 3 times the amount of damages which the State of North Carolina sustains because of the act of that person, together with all other relief allowed by law.

## COUNT FIVE
### TENNESSEE MEDICAID FALSE CLAIMS ACT
### (T.C.A. § 71-5-181, et. seq.)

232. All paragraphs of this Complaint set out above are hereby incorporated into Count Five as if fully set forth herein.

233. This Count is brought by Relators in the name of the State of Tennessee under the *qui tam* provisions of the Tennessee Medicaid False Claims Act, T.C.A. §§ 71-5-181 *et seq.*

53

234. By virtue of the above-described acts, Defendants knowingly presented or caused to be presented to the State of Tennessee false or fraudulent claims for payment or approval under the Medicaid program, in violation of T.C.A. § 71-5-182(a)(1)(A).

235. By virtue of the above-described acts, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claims under the Medicaid program, in violation of T.C.A. § 71-5-182(a)(1)(B).

236. By virtue of the above-described acts, among other things, Defendants knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money, or property to the State of Tennessee, or knowingly concealed, or knowingly and improperly avoided, or decreased an obligation to pay or transmit money or property to the State of Tennessee, relative to the Medicare program, in violation of T.C.A. § 71-5-182(a)(1)(D).

237. As a result of the Defendants' fraudulent conduct, the State of Tennessee has been damaged in amounts to be determined at trial.

238. Additionally, the State of Tennessee is entitled to a civil penalty of not less than five thousand dollars ($5,000) and not more than twenty-five thousand dollars ($25,000), for each false claim, plus 3 times the amount of damages which the State of Tennessee sustains because of the act of that person, together with all other relief allowed by law.

## PRAYER FOR RELIEF

**WHEREFORE**, Relators pray for judgment against Defendants as follows:

1. On Count One under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are authorized by law, together with all such further relief as may be just and proper;

54

2.      On Count Two under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are authorized by law, together with all such further relief as may be just and proper;

3.      On Count Three under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are authorized by law, together with all such further relief as may be just and proper;

4.      On Count Four under the North Carolina False Claims Act, for the amount of the State of North Carolina's damages, trebled as required by law, and such civil penalties as are authorized by law, together with all such further relief as may be just and proper;

5.      On Count Five under the Tennessee Medicaid False Claims Act, for the amount of the State of Tennessee's damages, trebled as required by law, and such civil penalties as are authorized by law, together with all such further relief as may be just and proper;

6.      That Relators be awarded the maximum Relators' share amount pursuant to 31 U.S.C. § 3730(c), N.C. Gen Stat. §1-610, and T.C.A. § 71-5-183(d);

7.      That judgment be granted for the United States of America, State of North Carolina, State of Tennessee and Relators and against Defendants for any costs, including, but not limited to, court costs, expert fees, and all attorneys' fees incurred by Relator in the prosecution of this case, including, but not limited to, all attorney fees and costs available pursuant to 31 U.S.C. § 3730(d), N.C. Gen Stat. §1-610, and T.C.A. § 71-5-183(d); and

8.      That the United States, State of North Carolina, State of Tennessee, and Relator be granted such other and further relief as the Court deems just and proper; and.

9.      That the United States, the State of North Carolina, the State of Tennessee and Relators be granted a trial by jury on all issues so triable.

Respectfully submitted this 12th day of August, 2021.

**RABON LAW FIRM, PLLC**

Charles H. Rabon, Jr.
N.C. State Bar No. 16800
crabon@usfraudattorneys.com
Rabon Law Firm, PLLC
413 S. Sharon Amity Rd., Suite C
Charlotte, NC 28211
Tel. 704-247-3247
Fax 704-208-4645

**WILBANKS & GOUINLOCK, LLP**
Marlan B. Wilbanks
Georgia Bar No. 758223
(*pro hac vice pending*)
Susan S. Gouinlock
Georgia Bar No. 303217
(to be admitted *pro hac vice*)
3490 Piedmont Road, NE
Suite 1010
Atlanta, Georgia 30305
Tel.: (404) 842-1075
Fax: (404) 842-0559
mbw@wilbanksgouinlock.com
ssg@wilbanksgouinlock.com

**WITHROW, MCQUADE & OLSEN, LLP**
Scott C. Withrow
Georgia Bar No. 772330
(to be admitted *pro hac vice*)
3379 Peachtree Road, NE
Suite 970
Atlanta, Georgia 30326
Tel.: (404) 814-0200
Fax: (404) 814-0009
swithrow@wmolaw.com

56

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served the foregoing **COMPLAINT** upon each of the government plaintiffs in this lawsuit by depositing a copy of same in the United States mail, postage prepaid, in envelopes addressed as follows and sent electronic copies to the email addresses shown below as well:

> The Honorable Merrick Garland, Esq.
> Attorney General of the United States
> c/o U.S. Department of Justice
> Civil Division
> 950 Pennsylvania Avenue, N.W.
> Washington, DC 20530-0001
> Civilfrauds.quitams@usdoj.gov
>
> The Honorable William T. Stetzer, Esq.
> Acting United States Attorney
> c/o Katherine Armstrong, Esq., AUSA
> U.S. Attorney's Office, WDNC
> 227 West Trade Street, Suite 1650
> Charlotte, N.C. 28202
> Katherine.Armstrong@usdoj.gov
>
> The Honorable Josh Stein, Esq.
> Attorney General, State of North Carolina
> c/o F. Edward Kirby, Jr.
> North Carolina Dept. of Justice
> 5505 Creedmoor Rd., Suite 300
> Raleigh, N.C. 27612
> FKirby@ncdoj.gov
>
> The Honorable Herbert H. Slatery III, Esq.
> Attorney General, State of Tennessee
> c/o Tony Hullender, Esq., Deputy Attorney General
> Medicaid Fraud and Integrity Division
> Office of the Attorney General
> P.O. Box 20207
> Nashville, TN 37202
> Tony.Hullender@ag.tn.gov

This 12th day of August, 2021.

**Wilbanks & Gouinlock, LLP**

*/s/ Susan S. Gouinlock*
Susan S. Gouinlock
Georgia Bar No. 303217
(to be admitted *pro hac vice*)
3490 Piedmont Road, NE
Suite 1010
Atlanta, Georgia 30305
Tel. 404-842-2075
Fax. 404-842-0559