UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

UNITED STATES OF AMERICA, *ex rel.* )
ALANA SULLIVAN, J. BRITTON TABOR, ) Case No. 1:25-cv-155
)
    *Relators,* ) Judge Curtis L. Collier
)
v. ) Magistrate Judge Christopher H. Steger
)
MURPHY MEDICAL CENTER, INC., d/b/a )
ERLANGER WESTERN CAROLINA )
HOSPITAL, *et al.*, )
)
    *Defendants.* )

## **MEMORANDUM**

Before the Court is a motion by Defendants Chattanooga-Hamilton County Hospital Authority d/b/a Erlanger Health System, d/b/a Erlanger Medical Center, Murphy Medical Center, Inc. d/b/a/ Erlanger Western Carolina Hospital, and Erlanger Health (collectively, "Defendants") to dismiss the United States' ("Government") complaint in intervention (Doc. 50). (Doc. 73.)

### I.    BACKGROUND

    **A.**    **Relevant law**

The Court first summarizes the relevant law regarding the False Claims Act and the Stark Law.

    **1.**    **The False Claims Act**

The False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq.*, imposes civil liability on persons and companies who defraud government programs. The FCA imposes civil liability for knowingly presenting, or causing to be presented, false or fraudulent claims to the United States Government for payment or approval. *Id.* § 3729(a)(1)(A). In addition, the FCA prohibits a

1

person from knowingly making, using, or causing to be made or used, a false record or false statement that is material to a false or fraudulent claim. *Id.* § 3729(a)(1)(B). The FCA also imposes liability for knowingly employing a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the government, commonly referred to as a "reverse" false claim. *Id.* § 3729(a)(1)(G). Those who violate the FCA are liable for civil penalties up to $10,000 and treble damages. *Id.* § 3729(a)(1).

To promote enforcement of the FCA, private individuals or organizations, called relators, can bring *qui tam* actions on behalf of the United States. *Id.* § 3730(b)(2). After the relator files a complaint, the United States has the option of intervening and conducting the litigation itself. *Id.* § 3730(b)(4)(B). If the United States opts to not intervene, the relator may proceed individually. *Id.* § 3730(c)(3). Successful relators are awarded a portion of the award ranging from ten to thirty percent, depending on the relator's role in the case and whether the government chose to intervene. *Id.* § 3730(d). To protect whistleblowers, the FCA also includes an anti-retaliation provision to protect individuals who make efforts in furtherance of an action under the statute or to stop a violation of the FCA. *Id.* § 3730(h).

### 2. The Stark Law

The Stark Law, also known as the Physician Self-Referral Act, 42 U.S.C. § 1395nn(a), is "designed to prevent abusive self-referrals." *McDonnell v. Cardiothoracic Vascular Surgical Assocs., Inc.*, No. C2-03-79, 2004 U.S. Dist. LEXIS 29436, at *15 (S.D. Ohio July 28, 2004). A doctor is prohibited from referring Medicare or Medicaid patients for inpatient or outpatient services to hospitals with which the doctor has a financial relationship. *Id.* at *16. If a physician has a financial relationship with a hospital, "(a) the physician may not make a referral to the hospital for the furnishing of health services and (b) the hospital may not present a claim to

2

Medicare for any services furnished pursuant to a referral." *Cardiovascular & Thoracic Surgs., Inc. v. St. Elizabeth Med. Ctr., Inc.*, No. 1:10-cv-846, 2012 U.S. Dist. LEXIS 128802, at *17 (S.D. Ohio Sept. 11, 2012) (citing 42 U.S.C. § 1395nn(a)(1)). There are several enumerated exceptions, which include situations like certain rentals of office space, physician recruitment, and isolated transactions. 42 U.S.C. § 1385nn.

B. **Factual Background**[1]

Relators Alana Sullivan and J. Britton Tabor are the former Chief Compliance Officer and former Chief Financial Officer, respectively, of Erlanger. (Doc. 119 ¶ 3.) They originally filed this action on August 12, 2021. (Doc. 2.) The United States has intervened as to claims that "Defendants knowingly submitted or caused the submission of claims for payment to the Medicare Program for hospital services that were referred by physicians with whom they had financial relationships which did not satisfy the requirements of any applicable exception of the physician self-referral law." (Doc. 50 at 5.)

The Government's complaint alleges that Erlanger had several financial relationships with physicians it employed which violated the Stark Law, and that it billed Medicare for procedures referred by physicians with whom Erlanger had those financial relationships. (*Id.* ¶ 170.) It alleges that Erlanger paid large salaries for medical director and academic positions without regard to whether the required work was actually performed. (*Id.* ¶ 87.) According to the Government, Erlanger also added productivity bonuses and uncapped payments for covering on-call shifts. (*Id.* ¶¶ 54, 91.) There were also sign-on, retention, and program bonuses that provided "additional compensation to revenue generating physicians." (*Id.* ¶ 94.) As a result, Erlanger had illegal

---

[1] This section takes all facts in the complaint as true, as the Court is required to do under Federal Rule of Civil Procedure 12(b)(6).
3

financial relationships with these physicians and paid physician salaries that were above fair-market-value. (*Id.* ¶ 56.) The United States also alleges that Erlanger knew that physician compensation exceeded fair market value and ignored warnings that its compensation exceeded the level of service that physicians were providing. (*Id.* ¶¶ 69–70, 120–122, 137, 145.) And it states that Erlanger's false representations certifying compliance with the Stark Law "were material to Medicare's decision whether to pay Erlanger's claims and were intended to induce Medicare to pay those claims." (*Id.* ¶ 155.)

C. **Procedural Background**

On August 12, 2021, Relators Alana Sullivan and J. Britton Tabor, the former Chief Compliance Officer and former Chief Financial Officer of Erlanger, filed a complaint in the Western District of North Carolina alleging that Erlanger violated both the Stark Law and Anti-Kickback Statute (AKS), as well as state law. (Doc. 2 at 2.) They primarily alleged that Erlanger paid illegal financial incentives to physicians for referrals. (*Id.*) The United States filed a complaint in intervention (Doc. 50), where it intervened only as to the claims that Defendants "violated the FCA by submitting or causing the submission of claims to Medicare that were referred by physicians with whom Erlanger had employment relationships that violated the Stark Law." (Doc. 44 at 1–2.)[2]

---

[2] While the action was pending in North Carolina, three physicians—Stephen Adams, Julie Adams, and Scott Steinmann—brought a *qui tam* action in the Eastern District of Tennessee on April 20, 2021. (Case No. 1:21-cv-84, Doc. 1.) The complaint originally alleged that Erlanger engaged in improper billing by scheduling overlapping surgeries that did not conform to Medicare or Medicaid rules and regulations. (*Id.* at 9.) Plaintiffs filed an amended complaint on January 5, 2023 (Case No. 1:21-cv-84, Docs. 51–54.) This complaint added claims that Erlanger violated the FCA through improper financial incentives to employed physicians to induce referrals. (Case No. 1:21-cv-84, Doc. 53 ¶¶ 253–319.) These included allegations that Erlanger compensated employed physicians based on the volume or value of referrals, (*Id.* at 27), Erlanger paid faculty salaries above fair market value for work not performed as improper inducement (*Id.* at 29), Erlanger used paid academic appointments with few or no requirements to lower the threshold at

4

On May 15, 2025, this action was transferred from the Western District of North Carolina to the Eastern District of Tennessee. (Doc. 90.)

## II. STANDARD OF REVIEW

A defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In ruling on a motion to dismiss under Rule 12(b)(6), a court must accept all of the factual allegations in the complaint as true and construe the complaint in the light most favorable to the plaintiff. *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009) (quoting *Hill v. Blue Cross & Blue Shield of Mich.*, 49 F.3d 710, 716 (6th Cir. 2005)). The court is not, however, bound to accept bare assertions of legal conclusions as true. *Papasan v. Allain*, 478 U.S. 265, 286 (1986). A court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a complaint need only contain a "short and plain statement of the claim showing that the pleader is entitled to relief," *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)), this statement must nevertheless contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. Plausibility "is not akin to a 'probability requirement,' but it asks for more

---

which surgeons are eligible for productivity-based incentive compensation (*Id.* at 35), and that Erlanger's surgeons received credit and compensation for work they did not perform (*Id.* at 36).

Erlanger and the United States filed motions to dismiss, both of which argued that these claims were barred by the FCA's "first-to-file" bar because such claims were already being pursued in this action in the Western District of North Carolina. (Case No. 1:21-cv-84, Doc. 176 at 5.) The Court granted Erlanger's motion to dismiss the claims based on the AKS and Stark violations based on the "first-to-file" bar. This was because the Western District of North Carolina complaint and the amended complaint "allege[d] exactly the same fraudulent scheme, with regard to the Stark and AKS claims." (*Id.* at 6.)

than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678.

Because claims brought under the False Claims Act sound in fraud, they are also subject to a heightened pleading standard under Federal Rule of Civil Procedure 9(b). The claimant must "state with particularity the circumstances constituting fraud or mistake," although scienter "may be alleged generally." Fed. R. Civ. P. 9(b). This means that "qui tam plaintiffs must adequately allege the entire chain—from start to finish—to fairly show defendants caused false claims to be filed." *United States ex rel. Martin v. Hathaway*, 63 F.4th 1043, 1047 (6th Cir. 2023) (quoting *United States ex rel. Ibanez v. Bristol-Myers Squibb Co.,* 874 F.3d 905, 914 (6th Cir. 2017). "Pleading an actual false claim with particularity is an indispensable element of a complaint that alleges a FCA violation in compliance with Rule 9(b)." *United States ex rel Bledsoe v. Cmty. Health Sys.*, 501 F.3d 493, 504 (6th Cir. 2007) ("Bledsoe II"). "In complying with Rule 9(b), a plaintiff, at a minimum, must 'allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *United States ex rel. Bledsoe v. Cmty. Health Sys.*, 342 F.3d 634, 643 (6th Cir. 2003) ("Bledsoe I") (quoting *Coffey v. Foamex L.P.*, 2 F.3d 157, 161–62 (6th Cir. 1993). But "a relator need not plead 'every specific instance of fraud where [his] allegations encompass many allegedly false claims over a substantial period of time." *United States ex rel.*

6

*Daugherty v. Bostwick Labs.*, No. 1:08-cv-354, 2012 U.S. Dist. LEXIS 178641, at *13 (S.D. Ohio Dec. 14, 2012) (quoting *Bledsoe II*, 501 F.3d at 504).

### III. <u>DISCUSSION</u>

Defendants seek to dismiss claims regarding unidentified physicians or compensation schemes put forth in paragraph 153 of the Government's complaint in intervention. (Doc. 50 ¶ 153.) The complaint in intervention provides ten representative examples of false claims naming six individual physicians. (Doc. 50 ¶¶ 180–189.) The Government also alleges a larger fraudulent scheme; it alleges that "[the] pattern and practice of paying compensation to employed physicians that exceeded fair market value . . . extended to additional physicians and compensation arrangements which the United States has not yet been able to identify," and that these arrangements "gave rise to additional False Claims Act violations." (*Id.* ¶ 153.) It is the allegations in this paragraph of the complaint that Defendants argue are deficient; Defendants seek to dismiss these claims regarding unidentified additional physicians and compensation arrangements. (Doc. 114 at 11.)

Defendants argue that "[p]leadings that rely simply on a plaintiff's 'belief' or 'information and belief' are insufficient to satisfy Rule 9(b)." (Doc. 114 at 9–10.) They further argue that "the government's Information and Belief Allegations [] undermine the purposes underlying Rule 9(b) because they would permit a plaintiff to generally assert an allegation of fraud claim in the first instance." (*Id.* at 12.) The Government responds that "[w]hen an FCA complaint sufficiently alleges a course of conduct that led to a number of false claims, courts consistently hold that at least one representative example of the broader set of claims is sufficient to plead that false claims were submitted as part of the scheme." (Doc. 117 at 9.) Defendants reply that the sample at hand does not illustrate the full universe of claims submitted under the fraudulent scheme, such that the

7

indefinite set of claims in paragraph 153 are not sufficiently represented by the ten examples. (Doc. 120 at 9.)

The Government is correct. The Court of Appeals for the Sixth Circuit has held that "where a relator pleads a complex and far-reaching fraudulent scheme with particularity, and provides examples of specific false claims submitted to the government pursuant to that scheme, a relator may proceed to discovery on the entire fraudulent scheme." *Bledsoe II*, 50 F.3d at 510; *see also United States ex rel. Roycroft v. GEO Grp., Inc.* 722 F. App'x 404, 406 (6th Cir. 2018) ("At the pleadings stage, this requirement is satisfied so long as the relator pleads the presentment of at least one representative false claim with particularity in compliance with Rule 9(b).") The Court of Appeals was careful to avoid construing a fraudulent scheme at too high a level of generality such that the pleading requirements of Rule 9(b) would be meaningless, but recognized that too narrow a construction would undermine policies allowing relators to plead examples rather than every single false claim. *Bledsoe II*, 501 F.3d at 510. Therefore, the Court of Appeals set the standard that "[i]n order for a relator to proceed to discovery on a fraudulent scheme, the claims that are pled with specificity must be characteristic example[s] that are illustrative of [the] class of all claims covered by the fraudulent scheme." *Id.* at 511 (internal quotations omitted).

Here, the Government adequately pleaded several representative examples of the larger scheme upon which the information and belief allegations rely. These examples represent the complex and far-reaching scheme the Government put forth in paragraph 153 of its complaint. The larger fraudulent scheme which Defendants argue is not adequately pleaded is the "pattern and practice of paying compensation to employed physicians that exceeded fair market value." (Doc. 50 ¶ 153.) But the representative examples show exactly this conduct. The Government lists six physicians and noted that Medicare paid Erlanger approximately $27.8 million for claims

8

that Erlanger submitted to Medicare for hospital services referred by several identified physicians "during the time periods in which Erlanger's compensation to those physicians exceeded fair market value." (*Id.* ¶ 190.) Each lists a physician with a financial relationship with Erlanger who referred a patient for a procedure which was eventually billed to Medicare. (*Id.* ¶¶ 180-89.) It gives the name of the physician, the time period in which the patient was referred, details about the procedure, where it occurred, and how much the claim cost. A "materially similar set of claims could have been produced with a reasonable probability by a random draw from the total pool of all claims." *Bledsoe II*, 501 F.3d at 511.

The representative claims are claims submitted where there was a financial relationship between Erlanger and the hospital and where the compensation exceeded fair market value. The larger scheme pleaded in the complaint (Doc. 50 ¶ 153) asserts that the exact type of behavior alleged in each of the representative claims existed for an additional number of physicians and compensation arrangements. The complaint also alleges extensive details about the amount each physician was paid, the physicians who were paid, and the time period in which they were paid. (*Id.* ¶ 147–152); *see, e.g., United States v. Assocs. in Eye Care, P.S.C.*, No. 13:27-GFVT, 2014 WL 414231, at *5 (E.D. Ky. Feb. 4, 2014) (finding that, where the complaint alleges extensive detail involving several examples of the alleged scheme, the plaintiff was "not required to provide exhaustive detail on every one of those hundreds of allegedly false claims."). And it alleges specific details of the knowledge that Defendants had of these schemes violating the Stark Act. (Doc. 50 ¶¶ 69–70, 120–122, 137, 145.)

Defendants claim that this class includes "potentially thousands of financial relationships." (Doc. 114 at 13.) It is true that the Government has not identified how many additional physicians and compensation arrangements may have existed. But that does not matter. There is no numerical

9

Case 1:25-cv-00155-CLC-CHS   Document 126   Filed 02/26/26   Page 9 of 11
PageID #: 539

threshold as to how many examples are sufficient to be representative of a larger scheme, nor does any case law suggest that the Government must identify the number of claims. Rather, *Bledsoe II* just requires representative claims actually represent the whole class of claims. While Defendants are correct that Plaintiffs may not simply allege that false claims must have been submitted, that is not the case here. Because this case has several adequate representative examples, it is distinguishable from cases in which the claim was dismissed because there was *no* representative example to support information and belief allegations. *C.f., Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 874, 877 (6th Cir. 2006) (affirming dismissal of a complaint when it did not identify any specific claims submitted to the Government); *United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 915 (6th Cir. 2017) (dismissing claims where "Relators allege knowledge of a complex scheme related to the promotion of Abilify, but they do not provide any representative claim that was actually submitted to the government for payment.").

Erlanger's position advocates for a stricter pleading standard than Rule 9(b) requires. The Court of Appeals has been clear that a complaint need not identify every single example of fraudulent conduct so long as the representative examples provide adequate notice. *See United States v. Fazzi Assocs.*, 16 F.4th 192, 197 (6th Cir. 2021). ("The touchstone is whether the complaint provides the defendant with notice of a specific representative claim that the plaintiff thinks was fraudulent.") Here, the complaint provides several examples of fraudulent conduct that puts Defendant on notice of the other types of conduct that would be included in the fraudulent scheme.

## IV. CONCLUSION

For the foregoing reasons, the Court will **DENY** Defendants' motion to dismiss.

**AN APPROPRIATE ORDER WILL ENTER.**

                                      **/s/**
                                      **CURTIS L. COLLIER**
                                      **UNITED STATES DISTRICT JUDGE**