UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| ALANA SULLIVAN, *as Relator on behalf of the United States of America, the State of North Carolina and the State of Tennessee, et al.*, | ) ) ) ) | |
| | ) | Case No. 1:25-cv-155 |
| *Plaintiffs,* | ) ) | Judge Curtis L. Collier |
| v. | ) ) | Magistrate Judge Christopher H. Steger |
| MURPHY MEDICAL CENTER, INC., d/b/a ERLANGER WESTERN CAROLINA HOSPITAL, *et al.*, | ) ) ) ) | |
| *Defendants.* | ) | |

**M E M O R A N D U M**

Before the Court is a motion by Defendants Chattanooga-Hamilton County Hospital Authority d/b/a Erlanger Health System, d/b/a Erlanger Medical Center, Murphy Medical Center, Inc. d/b/a/ Erlanger Western Carolina Hospital, and Erlanger Health (collectively, "Defendants" or "Erlanger") to dismiss Relators' Second Amended Complaint (Doc. 119). (Doc. 121.)

I.   **BACKGROUND**

A.   **Relevant law**

The Court first summarizes the relevant law regarding the False Claims Act, the Stark Law, and the Anti-Kickback Statute.

1.   **The False Claims Act**

The False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq.*, imposes civil liability on persons and companies who defraud government programs. The FCA imposes civil liability for knowingly presenting, or causing to be presented, false or fraudulent claims to the United States Government for payment or approval. 31 U.S.C. § 3729(a)(1)(A). In addition, it is prohibited for

a person to knowingly make, use, or cause to be made or used, a false record or false statement that is material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B). The FCA also imposes liability for knowingly employing a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the government, commonly referred to as a "reverse" false claim. 31 U.S.C. § 3729(a)(1)(G). Those who violate the FCA are liable for civil penalties up to $10,000 and treble damages. 31 U.S.C. § 3729(a)(1).

To promote enforcement of the FCA, private individuals or organizations, called relators, can bring *qui tam* actions on behalf of the United States. *Id.* § 3730(b)(2). After the relator files a complaint, the United States has the option of intervening and conducting the litigation itself. *Id.* § 3730(b)(4)(B). If the United States opts to not intervene, the relator may proceed individually. *Id.* § 3730(c)(3). Successful relators are awarded a portion of the award ranging from ten to thirty percent, depending on the relator's role in the case and whether the government chose to intervene. *Id.* § 3730(d). To protect whistleblowers, the FCA also includes an anti-retaliation provision to protect individuals who make efforts in furtherance of an action under the statute or to stop a violation of the FCA. *Id.* § 3730(h).

### 2. The Anti-Kickback-Statute ("AKS")

The Anti-Kickback-Statute ("AKS"), 42 U.S.C. § 1320a–7b(b), makes it a crime to pay any renumeration directly or indirectly, overtly or covertly, to "refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320(b)(2). While "[i]n some industries, it is acceptable to reward those who refer business to you… in the Federal health care programs, paying for referrals is a crime." Fraud & Abuse Laws, U.S. Dep't of Health

and Human Servs., https://oig.hhs.gov/compliance/physician-education/fraud-abuse-laws/ (last visited Dec. 10, 2025).

### 3. The Stark Law

The Stark Law, also known as the Physician Self-Referral Act, 42 U.S.C. § 1395nn(a), is "designed to prevent abusive self-referrals." *McDonnell v. Cardiothoracic Vascular Surgical Assocs., Inc.*, No. C2-03-79, 2004 U.S. Dist. LEXIS 29436, at *15 (S.D. Ohio July 28, 2004). A doctor is prohibited from referring Medicare or Medicaid patients for inpatient or outpatient services to hospitals with which the doctor has a financial relationship. *Id.* at *16. If a physician has a financial relationship with a hospital, "(a) the physician may not make a referral to the hospital for the furnishing of health services and (b) the hospital may not present a claim to Medicare for any services furnished pursuant to a referral." *Cardiovascular & Thoracic Surgs., Inc. v. St. Elizabeth Med. Ctr., Inc.*, No. 1:10-cv-846, 2012 U.S. Dist. LEXIS 128802, at *17 (S.D. Ohio Sept. 11, 2012) (citing 42 U.S.C. § 1395nn(a)(1)). There are several enumerated exceptions, which include situations like certain rentals of office space, physician recruitment, and isolated transactions. 42 U.S.C. § 1385nn.

### B. Factual Background[1]

Relators Alana Sullivan and J. Britton Tabor are respectively the former Chief Compliance Officer and former Chief Financial Officer of Erlanger. (Doc. 119 ¶ 3.) Relators argue that Erlanger "offered and paid renumeration in a variety of ways … to induce referrals from physicians it did not employ." (*Id.* ¶ 189.) Several were physicians who held ownership interests in University Surgical Associates, PLLC (collectively referred to as "USA Physicians"). (*Id.*) The

---

[1] This section takes all facts in the complaint as true, as the Court is required to do under Federal Rule of Civil Procedure 12(b)(6). It ignores the allegations in the complaint about the employed physicians, as those claims are being pursued by the Government.

rest were "community physicians," or those not employed by Erlanger or University Surgical Associates, PLLC. (*Id.* ¶ 220.) This renumeration constituted kickbacks and direct compensation arrangements. (*Id.* ¶ 195.)

Erlanger paid compensation to the University of Tennessee College of Medicine ("UTCOM") for faculty supervising residents at Erlanger's Baroness Hospital and specified that certain funds were to be paid by UTCOM to specific USA Physicians and community physicians who referred services to Erlanger. (*Id.* ¶ 197, 220.) Relators name eight USA physicians and four community physicians who received faculty salary pass-through payments from Erlanger. (*Id.* ¶¶ 198, 220.) The faculty salaries were paid by Erlanger in amounts based on their referrals to Erlanger. (*Id.* ¶ 202.) As a result, "State of Tennessee funds were diverted to pay kickbacks and excessive compensation to the physician members of USA PC." (*Id.*) Relators also allege that Erlanger paid USA Physicians, through a pass-through scheme with UTCOM, the cost of four nurse practitioners to induce referrals from USA. (*Id.* ¶ 207.)

Relators also claim that Erlanger paid USA Physicians for nonexistent call coverage and unnecessary medical director services. (*Id.* ¶ 204–05.) According to Relators, Erlanger paid USA Physicians to purportedly provide specialty trauma call coverage services, but some of the physicians who were paid did not present at the hospital and deferred the patient care until the next day. (*Id.* ¶ 204.) According to Relators, Erlanger "paid USA PC for the nonexistent call coverage as a means of renumerating high referring USA Physicians in violation of the AKS," at a rate higher than fair market value. (*Id.*) Additionally, Erlanger paid USA PC for certain physicians to act as medical directors at Erlanger, but Erlanger created more medical directorships than was commercially reasonable in order to funnel more money to the referring USA Physicians. (*Id.* ¶ 205.) This was done to induce those physicians to provide referrals. (*Id.*)

4

Relators also claim Erlanger had a contract with USA Physicians to manage Erlanger's outpatient surgery center at a value much higher than fair market value because of USA Physicians's referrals. (*Id.* ¶ 206.) Another scheme was that Erlanger provided free or low-cost IT support services at USA Physicians's medical offices in exchange for referrals (*Id.* ¶ 208).

All of these schemes, Relators allege, "resulted in[] Erlanger submitting false claims to the Government," and that "[a]bsent the kickbacks pled herein, Erlanger would not have captured the referrals from USA PC." (*Id.* ¶ 210.) The kickbacks were effective, evidenced by the fact that Erlanger tracked lost referrals using data from the Tennessee Hospital Association and penalized physicians for lack of referrals. (*Id.* ¶ 191.) Relators also allege Erlanger falsely certified compliance with AKS and the Stark Law and argue these false certifications were, in themselves, false representations violating the FCA. (*Id.* ¶¶ 227, 232.) They claim that these false certifications of compliance were material to decisions to pay Erlanger's claims. (*Id.* ¶¶ 238–239.)

While the complaint presents seven representative false claims in total, six of those relate to allegations about the employed physicians. The Government has intervened and is leading the litigation as to those claims. (Doc. 44.) As to the remaining allegations about non-employed, private physicians, Relators give one representative false claim. Dr. Craig Murray, a member of USA PC, referred Medicare Patient #7 for inpatient hospital services at Erlanger East Hospital. (Doc. 119 ¶ 236.) That patient was then transferred to Erlanger Baroness Hospital. (*Id.*) Erlanger submitted electronic claims for those services to United Healthcare Medicare Silver, which paid Erlanger $24,277.21. (*Id.*) When Erlanger submitted that claim, it had paid physicians, including Dr. Murray, renumeration and excessive compensation in the forms described in the preceding paragraphs. (*Id.*) Erlanger also certified in its claim that it was compliant with the AKS and the Stark Law, even though it knew it was not. (*Id.*)

5

## C. Procedural Background

This action comes before the Court with a somewhat convoluted procedural background. On August 12, 2021, Relators Alana Sullivan and J. Britton Tabor, the former Chief Compliance Officer and former Chief Financial Officer of Erlanger, filed a complaint in the Western District of North Carolina alleging that Erlanger violated both the Stark Law and Anti-Kickback Statute, as well as state law. (Doc. 2 at 2.) This is the present action. They primarily alleged that Erlanger paid illegal financial incentives to physicians for referrals. (*Id.*) The United States filed a complaint in intervention (Doc. 50), where it intervened only as to the claims that Defendants "violated the FCA by submitting or causing the submission of claims to Medicare that were referred by physicians with whom Erlanger had employment relationships that violated the Stark Law." (Doc. 44 at 1–2.) Relators proceeded with the non-intervened claims against Defendants, alleging violations of the FCA arising from referrals from non-employed physicians in violation of both the Stark Law and Anti-Kickback Statute. On October 1, 2024, Relators filed their Amended Complaint (Doc. 78) proceeding on the non-intervened claims.

While the action was pending in North Carolina, three physicians—Stephen Adams, Julie Adams, and Scott Steinmann—brought a *qui tam* action in the Eastern District of Tennessee on April 20, 2021. (Case No. 1:21-cv-84, Doc. 1.) The complaint originally alleged Erlanger engaged in improper billing by scheduling overlapping surgeries that did not conform to Medicare or Medicaid rules and regulations. (*Id.* ¶ 15.) Plaintiffs filed an amended complaint on January 5, 2023. (Case No. 1:21-cv-84, Docs. 51–54.) This complaint added claims that Erlanger violated the FCA through improper financial incentives given to employed physicians to induce referrals. (Case No. 1:21-cv-84, Doc. 53 ¶¶ 253–319.) The complaint included allegations that Erlanger

6

compensated employed physicians based on the volume or value of referrals, (*id.* ¶ 263), Erlanger paid faculty salaries above fair market value for work not performed as improper inducement (*id.* ¶ 272), Erlanger used paid academic appointments with few or no requirements to lower the threshold at which surgeons are eligible for productivity-based incentive compensation (*id.* ¶ 290), and that Erlanger's surgeons received credit and compensation for work they did not perform (*id.* ¶ 295). Erlanger and the United States filed motions to dismiss, both of which argued that these claims were barred by the FCA's "first-to-file" bar because such claims were already being pursued in this action, in the Western District of North Carolina. (Case No. 1:21-cv-84, Doc. 176 at 5.) The Court granted Erlanger's motion to dismiss the AKS and Stark violation claims based on the "first-to-file" bar. This was because the Western District of North Carolina complaint and the amended complaint "allege[d] essentially the same fraudulent scheme, with regard to the Stark and AKS claims." (*Id.* at 6.)

On May 15, 2025, this action was transferred from the Western District of North Carolina to the Eastern District of Tennessee. (Doc. 90.) Relators have filed a second amended complaint (Doc. 119) alleging violations of the Stark Act and the AKS by non-employed physicians. Relators acknowledge that the United States has "partially intervened in this action and has taken over prosecuting the allegations that Erlanger submitted false claims for procedures referred from physicians *employed* by Erlanger while paying those physicians in a manner prohibited by the Stark law." (Doc. 124 at 9.) But the United States did not intervene as to non-employed physicians. As such, the Court recognizes that the amended complaint contains duplicative allegations of the matters in which the United States intervened—specifically in its pleading that *employed* physicians violated the Stark Act. (Doc. 119 at 40–55; *see also* Doc. 122 at 19.) Such claims are being pursued by the United States, and the Court assumes that the claims about

employed physicians are not operative in this complaint because they are being pursued by the Government. (Doc. 50.) *See* 31 U.S.C. § 3730(c)(1) ("If the Government proceeds with the action, it shall have the primary responsibility of prosecuting the action."); *United States ex rel. Doghramji v. Cmty. Health Sys.*, 2019 U.S. Dist. LEXIS 172071, at *24 (M.D. Tenn. Oct. 2, 2019) ("Once the Government decides to intervene, the Government takes over the action as the plaintiff.") (internal quotations omitted).

Defendants seek to dismiss claims in Relators' second amended complaint alleging Erlanger overpaid certain private practice ("non-employed") physicians. (Doc. 121.)

## II.    STANDARD OF REVIEW:

### A.    Rule 12(b)(6)

A defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In ruling on a motion to dismiss under Rule 12(b)(6), a court must accept all of the factual allegations in the complaint as true and construe the complaint in the light most favorable to the plaintiff. *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009) (quoting *Hill v. Blue Cross & Blue Shield of Mich.*, 49 F.3d 710, 716 (6th Cir. 2005)). The Court is not, however, bound to accept bare assertions of legal conclusions as true. *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

In deciding a motion under Rule 12(b)(6), a court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a complaint need only contain a "short and plain statement of the claim showing that the pleader is entitled to relief," *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)), this statement must nevertheless contain "factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Id.* at 678. Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678.

Because claims brought under the False Claims Act sound in fraud, they are also subject to a heightened pleading standard under Federal Rule of Civil Procedure 9(b). The claimant must "state with particularity the circumstances constituting fraud or mistake," although scienter "may be alleged generally." Fed. R. Civ. P. 9(b). This means that "*qui tam* plaintiffs must 'adequately allege the entire chain—from start to finish—to fairly show defendants caused false claims to be filed.'" *United States ex rel. Martin v. Hathaway*, 63 F.4th 1043, 1047 (6th Cir. 2023) (quoting *United States ex rel. Ibanez v. Bristol-Myers Squibb Co.,* 874 F.3d 905, 914 (6th Cir. 2017)). "[P]leading an actual false claim with particularity is an indispensable element of a complaint that alleges a FCA violation in compliance with Rule 9(b)." *United States ex rel Bledsoe v. Cmty. Health Sys.*, 501 F.3d 493, 504 (6th Cir. 2007) ("Bledsoe II"). "In complying with Rule 9(b), a plaintiff, at a minimum, must 'allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.'" *United States ex rel. Bledsoe v. Cmty. Health Sys.*, 342 F.3d 634, 643 (6th Cir. 2003) ("Bledsoe I") (quoting *Coffey v. Foamex L.P.*, 2 F.3d 157, 161–62 (6th Cir. 1993)). But "a relator need not plead 'every specific instance of fraud where [his] allegations encompass many allegedly false claims over a substantial period of time." *United States ex rel.*

*Daugherty v. Bostwick Labs.*, No. 1:08-cv-354, 2012 U.S. Dist. LEXIS 178641, at *13 (S.D. Ohio Dec. 14, 2012) (quoting *Bledsoe II*, 501 F.3d at 504).

## III.   DISCUSSION

Erlanger makes three arguments.  First, they argue that Relators fail to plead any Stark or AKS scheme with particularity—falsity.  Second, they argue that Relators fail to adequately identify any false claims for payment submitted in connection with their schemes—presentment.  Third, they argue, in the alternative, that Relators are prohibited under both the statutory text of the FCA and Article II of the United States Constitution from pursuing the declined claims now that the Government is leading the litigation.  (Doc. 122 at 7.)

Plaintiffs argue that Erlanger is collaterally estopped by the Eastern District of Tennessee's January 19, 2024, Order in Case No. 1:21-cv-84 ("the *Adams* Order") finding that the claims added to the amended complaint in that case were barred by the first-to-file rule.  Plaintiff also argues that its complaint adequately pleads falsity and presentment, and, in the alternative, the *Prather* relaxed pleading standard applies.  (Doc. 124 at 11–30.)

The Court finds that Erlanger is not collaterally estopped from moving to dismiss the non-intervened claims.  However, the Court finds that Relators have adequately pleaded both falsity and presentment.  Regarding presentment, Relators' representative claim suffices as to the USA Physicians, and the *Prather* exception applies to both the claims about the USA Physicians and the community physicians.  And finally, Relators may proceed on the non-intervened claims under the FCA and Article II of the United States Constitution.

### A.   Defendants are not collaterally estopped from moving to dismiss Relators' non-intervened claims.

In the *Adams* Order, this Court found that certain allegations in the amended complaint brought in Case No. 1:21-cv-84 in the Eastern District of Tennessee by Relators Julie Adams,

Stephen Adams, and Scott Steinmann were barred by the first-to-file bar because this action was filed first in the Western District of North Carolina. Relators now argue that because this finding inherently required a finding that their originally filed complaint was sufficient under Rule 9(b), Defendants are now collaterally estopped ("issue-precluded") from relitigating the issue of the sufficiency of the complaint. (Doc. 124 at 6.)

For the first-to-file bar to apply in an FCA case, the first complaint must be sufficiently pleaded under Federal Rule of Civil Procedure 9(b). *Walburn v. Lockheed Martin Corp*, 431 F.3d 966, 973 (6th Cir. 2005) ("We fail to see how according preemptive effect to a fatally-broad complaint furthers the policy of encouraging whistleblowers to notify the government of potential frauds."). Therefore, a finding that issues in a complaint are barred by the first-to-file rule inherently requires a finding that the allegations of the complaint are sufficient under Rule 9(b).

Defendants argue the *Adams* Order did not decide the sufficiency of the allegations about non-employed physicians; rather, it only decided that the complaint regarding the intervened claims about employed physicians was sufficiently pleaded. (Doc. 125 at 19.) Defendants argue that "Chief Judge McDonough's Order in *Adams* did not consider or discuss [non-intervened allegations about non-employed physicians]." (*Id.*) They also note that "[i]t was only *after* Erlanger moved to dismiss Relators' non-intervened claims in October 2024 (10 months after the *Adams* Order) that Relators amended their complaint to add Claim #7 from Dr. Murray." (*Id.*) Furthermore, they cite several lines in the *Adams* Order that refer only to the sufficiency of the allegations about referrals from employed physicians and argue that the Order itself only refers to the scheme of hiring certain physicians who then engaged in this illegal activity. (*Id.* at 18–19.)

The Court of Appeals for the Sixth Circuit has established a four-part-test for issue preclusion.

1) [T]he precise issue raised in the present case must have been raised and actually litigated in the prior proceeding;
2) determination of the issue must have been necessary to the outcome of the prior proceeding;
3) the prior proceeding must have resulted in a final judgment on the merits; and
4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding.

*United States v. Cinemark USA, Inc.*, 348 F.3d 569, 583 (6th Cir. 2003). The party asserting issue preclusion bears the burden of establishing each element. *See Nguyen ex rel. United States v. City of Cleveland*, 534 F. App'x 445, 449 (6th Cir. 2013). Issue preclusion "serves the salutary purpose of forcing a party to make its claim once, as best it can, the first time." *Baumgardner v. Tenacity Mfg. Co.*, No. 1:11-cv-794, 2014 U.S. Dist. LEXIS 204442, at *18 (S.D. Ohio Nov. 4, 2014). "A district court may dismiss the action based on claim or issue preclusion even if the complaint includes 'a change in legal theory or the 'cast of characters—defendants.'" *Funk-Vaughn v. Rutherford Cty.*, No. 3:18-cv-1311, 2019 U.S. Dist. LEXIS 167029, at *4 (M.D. Tenn. Aug. 1, 2019) (quoting *Randles v. Gregart*, 965 F.2d 90, 93 (6th Cir. 1992)).

Here, the sufficiency of the allegations about non-employed physicians was not determined by the *Adams* Order. The amended complaint that the *Adams* Order addressed did not contain allegations about non-employed physicians; it only referred to schemes to hire physicians and schemes involving already-employed physicians. It was duplicative of the North Carolina complaint that barred it, but it covered less ground than the North Carolina complaint. (*See* Case No. 1:21-cv-84, Docs. 51–54.) Put differently, the *Adams* amended complaint was narrower than the North Carolina complaint, such that deciding the sufficiency of the entire *Adams* complaint does not cover the sufficiency of the entire North Carolina complaint.

The Court draws this conclusion from examining both the *Adams* Order and the amended complaint that the *Adams* Order addresses (Case No. 1:21-cv-84, Docs. 51–55, 176). The amended

complaint in *Adams* only refers to Stark Law and AKS violations by actions of employed physicians. (Case No. 1:21-cv-84, Doc. 53 at 253–310.) It never once mentions any of the schemes that the North Carolina complaint addresses with respect to referrals by non-employed physicians; it does not mention the various incentives or renumeration promised to the USA Physicians, for example, or the community physicians. And the *Adams* Order, accordingly, does not address allegations about non-employed physicians that were in the North Carolina complaint but not the *Adams* amended complaint. (Case No. 1:21-cv-84 at 176.)

Therefore, the allegations about non-employed physicians were not before the Court in the *Adams* Order, and their sufficiency was not actually litigated. The only claims the Court determined were sufficiently pleaded are the claims about the employed physicians. Therefore, Defendants are not collaterally estopped from challenging the sufficiency of the operative complaint about non-employed physicians here (Doc. 119).

**B.     The claims are pled with particularity.**

For a claim to succeed under the False Claims Act, Relators must show that "(1) the defendant made a false statement or created a false record; (2) with scienter; (3) that was 'material to the Government's decision to make the payment sought in the defendant's claim'; and (4) that the defendant submitted to the U.S. government causing it to pay the claim." *United States ex rel. Prather v. Brookdale Senior Living Communities,* 892 F.3d 822, 830 (6th Cir. 2018) (quoting *United States ex rel. Sheldon v. Kettering Health Network*, 816 F.3d 399, 408 (6th Cir. 2016)). "The mere allegation that a defendant violated the AKS or Stark Law does not create FCA liability unless the defendant knowingly submitted claims that falsely certified compliance with those laws, where such compliance was a prerequisite to payment." *United States ex rel. Dennis v. Health Mgmt.*

*Assocs.*, No. 3:09-cv-484, 2013 U.S. Dist. LEXIS 5212, at *36 (M.D. Tenn. Jan. 14, 2013). Defendants argue Relators have not pleaded falsity or presentment with requisite particularity, and they fail to plead a representative example claim.

### 1. Falsity

Relators argue "Erlanger's claims are false because Erlanger sought reimbursement for services referred by physicians to whom Erlanger was paying illegal incentives in violation of the Stark Law and/or the AKS, with false certifications of compliance with those laws." (Doc. 124 at 11.) These false certifications of compliance, they argue, constitute a violation under 31 U.S.C. § 3729(a)(1)(A)(B)(G). (*Id.*) In the alternative, Relators argue that the claims at issue are examples of certain claims that the AKS makes false as a matter of law. (*Id.* at 12.); *see also* 42 U.S.C. § 1320a-7b. Under the 2010 Amendments to the FCA, "an AKS violation automatically makes a claim 'false' if that claim [] 'includes items or services resulting from' the violation." *United States ex rel. Murphy v. TriHealth, Inc.*, No. 1:19-cv-168, 2025 U.S. Dist. LEXIS 143791, at *16 (S.D. Ohio July 28, 2025) (quoting 42 U.S.C. § 1320a-7b(g)).

Relators must allege an underlying violation for both their false certification theory and their alternative theory. *See id.* at *17. Defendants argue that "[f]or each purported violation, Relators fail to plead the basic *who, what, when, where, and how* that Rule 9(b) requires." (Doc. 122 at 17.) They argue that "[g]enerally alleging that Erlanger (or UTCOM) made payments in unknown amounts to unspecified physicians for unspecified services fails to provide sufficient detail to allow Erlanger to formulate a defense." (*Id.*)

Relators have sufficiently pleaded they paid renumeration to physicians in violation of both the AKS and the Stark Law and had direct and indirect compensation schemes in violation of the Stark Law with those physicians in exchange for referrals.

14

A prime facie Stark Law violation has three elements: "(1) a referral for designated health services, (2) a financial relationship, and (3) a Medicare claim for the referred services." *TriHealth*, 2025 U.S. Dist. LEXIS 143791, at *23. These elements sweep in a fair amount of permissible behavior; as such, there are four exceptions to the Stark Law. A financial relationship under the Stark Law "includes a compensation arrangement involving 'any remuneration directly or indirectly, overtly or covertly, in cash or in kind' between physician and the entity providing the referred services." *Id.* at 23 (quoting 42 U.S.C. § 1395nn(a)(2), (h)(1)).

Plaintiffs argue that "the compensation Erlanger paid to referring physicians or groups described in the Complaint violates the Stark Law in one or more of three possible ways." (Doc. 124 at 14.) They allege that the compensation exceeded fair market value, was commercially unreasonable, and/or was determined in a manner that took into account the volume or value of designated health services. (*Id.*) Defendants argue that Plaintiffs have not shown the alleged payment to doctors exceeded fair market value. (Doc. 122 at 13.)

The AKS establishes liability for "'knowingly and willingly offer[ing] or pay[ing] any *renumeration*… directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to refer an individual to a person for the furnishing . . . of any item or service' that is reimbursable under a federal health care program." *United States ex rel. Martin v. Hathaway*, 63 F.4th 1043, 1048 (6th Cir. 2023) (quoting 42 U.S.C. § 1320a-7b(b)(2)(A)). "To state a claim based on an Anti-Kickback Statute violation, Relator must allege facts that support an inference that [Defendant] (i)[]knowingly and willfully (ii) solicited or received, or offered or paid renumeration (iii) in return for, or to induce, referral or program-related business." *Daugherty*, 2012 U.S. Dist. LEXIS 178641 at *33.

"At base, then, the question before the Court is whether Relator sufficiently alleged facts from which the Court could plausibly infer that [the company] offered or provided something of value to physician practices in exchange for referrals back from those practices." *Id.* at \*34; *see also Martin*, 63 F.4th at 1048 (6th Cir. 2023) (defining renumeration under the AKS as "just payments and other transfers of value").

### a. Relators have shown renumeration in violation of both the Stark Law and AKS

Relators have shown renumeration sufficient to demonstrate both a Stark Law and an AKS Violation. Defendants argue that both statutes require some benchmark of fair market value. But this is not required by the statute. Of course, below-fair-market compensation has been found to constitute renumeration, and in cases that allege that type of renumeration, courts have dismissed cases without this element. *See, e.g., Dennis*, 2013 U.S. Dist. LEXIS 5212, at \*39 (citing *U.S. ex rel. Osheroff v. Tenet Healthcare Corp.,* No. 1:09-cv-22253, 2012 U.S. Dist. LEXIS 96434, at \*7 (S.D. Fla. July 12, 2012)); *United States v. Ctr. for Diagnostic Imaging, Inc.*, 787 F. Supp. 2d 1213, 1223 (W.D. Wash. 2011). But there are other types of renumeration, such as providing services for *no* cost. Plaintiffs alleged that "Erlanger re[n]u[m]erated USA and the USA Physicians by providing at either no cost or at greatly reduced cost … IT support services." (Doc. 119 at ¶ 208).

The Court finds that Plaintiffs have sufficiently pled renumeration in their allegations that Erlanger paid USA Physicians for *nonexistent* services. The complaint sufficiently alleges that Erlanger "paid USA PC for the nonexistent call coverage as a means of renumerating high referring USA Physicians in violation of the AKS." (*Id.* at ¶ 204). The same is true for the provision of free IT support services. (*Id.* ¶ 208.) While there is no benchmark value, IT support services and nurse practitioners necessarily add at least *some* value to USA Physicians; therefore, providing

16

these for free necessarily implies that they were being provided below market cost. *See TriHealth*, 2025 U.S. Dist. LEXIS 143791, at *21 ("This alleged something-for-nothing exchange supports an inference that Defendants paid the management fees to induce referrals."); *see also United States v. Millenium Radiology, Inc.*, No. 1:11-cv-825, 2014 U.S. Dist. LEXIS 138549, at *14 (S.D. Ohio Sept. 30, 2014) ("Providing these services for free would necessarily be providing them at below market rates and below cost.").

  **b.**  **Relators have shown a financial relationship in violation of the Stark Law.**

  The previous examples of renumeration, if true, demonstrate a direct financial relationship between Erlanger and the USA Physicians.

  Relators also allege an indirect financial relationship violative of the Stark Law through a pass-through scheme with UTCOM.  To allege an indirect financial relationship, Relators must allege that (1) "Between the referring physician … and the entity furnishing DHS there exists an unbroken chain of any number (but not fewer than one) of persons or entities that have financial relationships … between them;" (2)  "the referring physician … receives aggregate compensation from the person or entity in the chain with which the physician … has a direct financial relationship that varies with the volume or value of referrals or other business generated by the referring physician;" and (3) the entity providing referred services "has actual knowledge of, or acts in reckless disregard or deliberate ignorance of, the fact that the referring physician" has such a compensation arrangement."  42 C.F.R. § 411.354(c)(2).

  Relators allege that "Erlanger paid UT COM funds that Erlanger specified were to be paid by UT COM to specific USA Physicians who referred services to Erlanger," and identified several USA Physicians who received faculty salary pass-through payments.  (Doc. 119 ¶ 197–198.)  The complaint also lists the amounts paid to UTCOM for their salaries.  (*Id.* ¶ 199.)

17

Additionally, Relators have demonstrated an example of an indirect financial relationship with a community physician through a referral requirement. Relators have alleged that Dr. Brzezienski was subject to a referral requirement, where Erlanger, who paid Dr. Brzezienski a faculty salary and compensation for being chair of the department, required that a certain percentage of his procedures be performed at Erlanger (Doc. 119 ¶ 222.) More specifically, Relators allege that when Dr. Brzezienski was performing some procedures at an Erlanger competitor, Erlanger "confronted Dr. Brzezienski in a meeting attended by Erlanger CEO Kevin Spiegel, and Relator Tabor … [and] insisted that to maintain his chairmanship at UT COM with its concomitant pay, Dr. Brzezienski must perform fully 70%-75% of his procedures at Erlanger." (*Id.* ¶ 222.) This is evidence that the faculty physician's compensation took into account the "volume or value of referrals." 42 C.F.R. § 411.354(c)(2)(ii)(A)(1).

Defendants allege that each allegation fails to allege the who, what, when, where, and how of each scheme. (Doc. 122 at 14–17.) But these allegations do allege how much the physicians were paid, which physicians were paid, why they were paid, and how they were paid. Relators put forth the names of the physicians, their compensation, specific conversations, and how money was funneled to each physician. Furthermore, "where a relator pleads a complex and far-reaching fraudulent scheme with particularity, and provides examples of specific false claims submitted to the government pursuant to that scheme, a relator may proceed to discovery on the entire fraudulent scheme." *Bledsoe II*, 501 F.3d at 510. These examples will support "more generalized allegations of fraud … to the extent that the relator's examples are representative samples of the broader class of claims." *Id.* The Court will now turn to presentment and the adequacy of the representative claim, which Defendants argue are not sufficient to survive a motion to dismiss.

18

## 2. Presentment

"[I]t is not enough to allege that a defendant has an improper financial relationship with a physician … [f]or purposes of a false claim based upon a tainted arrangement, the key consideration is whether a physician referred a patient for which federal reimbursement was sought." *Dennis*, 2013 U.S. Dist. LEXIS 5212, at *40. That is why there is "'[a] clear and unequivocal requirement that a relator allege specific false claims' when pleading a violation of the FCA." *Kettering Health*, 816 F.3d at 411 (quoting *Bledsoe II*, 501 F.3d at 504). That unequivocal requirement "derives from the fact that 'the [FCA] statute attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the claim for payment.'" *Id.* (quoting *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 877-78 (6th Cir. 2006)) (internal quotation marks omitted). Thus, even if there were kickbacks being paid to non-employed physicians or Stark Law violative compensation arrangements, Relators must allege that these payments resulted in false claims being submitted—that either the physician referred a Medicare beneficiary to the hospital, or that the hospital billed any federal or state healthcare program for referred services. *See Dennis*, 2013 U.S. Dist. LEXIS 5212, at *41 (finding that although Relator alleged an improper financial relationship and kickbacks provided to a doctor, he did not allege that the doctor referred any Medicare or Medicaid patient to the hospital as a result of said relationship or kickbacks).

Defendants argue there are three issues with the representative claim. The first is that the representative claim only involves a USA Physician and is not representative of the community physicians. (Doc. 122 at 19.) The second is that "Relators had not even alleged that Erlanger entered into any financial relationship with Dr. Murray." (*Id.*) The third is that "the claim at issue was submitted to a private health insurance plan." (*Id.*) The Court will address each in turn.

19

First, it is true that the representative claim only involves a USA Physician and alleges no connection with the four non-USA community physicians. The Court finds this is not representative of the scheme with regard to non-USA community physicians. While one claim may be an example of a far-reaching scheme, it is not representative of the entire universe of allegations with respect to different organizations or physicians. The specific fraudulent conduct with respect to USA Physicians is an example of a fraudulent scheme as to USA Physicians, but it is not an example of conduct involving community physicians. Therefore, the Court finds that the representative claims only serve as representative claims with respect to USA Physicians.

Second, the financial relationship alleged with USA physicians is enough to impute that relationship onto Dr. Murray. Relators, by alleging an improper financial relationship with USA Physicians, have alleged a financial relationship with Dr. Murray. Relators alleged that "Dr. Murray joined USA PC in 2018 and was a USA member physician in September 2022 when he referred Patient #7 to Erlanger." (Doc. 119 ¶ 236.) "Under the [Stark Law] … [a] direct financial relationship exists where either the hospital pays the physician, or where the hospital pays the practice group (also known as the 'stand in the shoes provision' — the doctor stands in the shoes of his practice.")." *St. Elizabeth Med. Ctr., Inc.*, 2012 U.S. Dist. LEXIS 128802, at *17. Relators are correct that Dr. Murray, being a USA member physician, "stands in the shoes of his physician organization under the Stark Law." (Doc. 124 at 28.)

Third, submitting a claim to a Medicare Advantage Organization still implicates a federal payor for False Claims Act purposes, although there may be issues with materiality. Defendants also contend that "Claim #7 was also submitted to a private Medicare Advantage Organization, not to Medicare." (Doc. 125 at 14.) They argue that this does not satisfy the presentment

requirement of the FCA.  (*Id.*)  Relators assert that "Erlanger's challenge is baseless: The ultimate payer of the claim is Medicare and that is sufficient under the FCA."  (Doc. 124 at 28.)

Several districts describe Medicare Advantage Recipients as implicating a federal payor for FCA purposes.  *United States ex rel. Nolan v. HCA Healthcare, Inc.,* No. 3:20-cv-00978, 2025 U.S. Dist. LEXIS 186758, at *28 (M.D. Tenn. Sept. 22, 2025) ("Thus, the critical question in this case is whether anything required the HCA Hospitals to pay the TC costs for patients covered by Other Insurers, including Medicare Advantage (the only *federal* payor implicated in the Complaint for purposes of the FCA claims.)"); *United States ex rel. Arik v. DVH Hosp. Alliance, LLC*, No. 2:19-cv-1560, 2022 U.S. Dist. LEXIS 59667, at *11–12 (D. Nev. Mar. 31, 2022).  But such an analysis is not obvious given the structure of these programs, which defendants argue does not lend this kind of false claim to FCA liability.  (Doc. 125 at 14.)  The Court of Appeals for the Sixth Circuit has not decided this issue, stating that:

> The parties dispute whether nonpayment or underpayment to MAOs (private contractors), rather than the government itself, can be the subject of a reverse FCA claim. In *Allstate*, the panel noted "our sister circuits' concerns with assigning False Claims Act liability for payments owed to MAOs, which are private entities, and not the government." The panel set that issue aside, however, because it wasn't necessary to the resolution of the appeal. We do the same here.

*See U.S. ex rel. Michigan v. State Farm Mut. Auto. Ins. Co.*, No. 24-1379, 2025 U.S. App. LEXIS 1086, at *18 n.2 (6th Cir. Jan 15, 2025) (citations omitted).  Here, because there is only one representative false claim that involves a claim submitted to UnitedHealthcare Medicare Silver, a Medicare Advantage Plan Provider, the Court must resolve this issue.

Medicare Advantage Plans are plans offered by private companies funded both by premiums and Medicare itself.  In that sense, false claims presented to Medicare Advantage Plan providers are not directly "presented" to the Government; after all, these providers are "private entities, and not the government."  *United States ex rel. Angelo v. Allstate Ins. Co.*, 106 F.4th 441,

450 (6th Cir. 2024).  But the FCA states that the term "claim" refers to a claim that "is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government[] provides or has provided any portion of the money or property requested or demanded" or "will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded."  31 U.S.C. § 3729(b)(2)(A). Despite this language, Defendants nonetheless cite several cases rejecting False Claims Act liability in cases where the claim is presented to a Medicare Advantage Provider.  (Doc. 125 at 14.)  These cases focus on the structure of the Medicare Advantage Programs, which differs from traditional Medicare.

"Medicare Part C authorizes the payment of federal funds to private 'Medicare Advantage' organizations to manage the care of Medicare beneficiaries." *United States ex rel. Marshall v. Univ. of Tenn. Med. Ctr. Home Care Servs., LLC*, No. 3:17-cv-96, 3:19-cv-84, 2021 U.S. Dist. LEXIS 159167, at *4 (E.D. Tenn. Aug. 23, 2021).  "Although most beneficiaries still receive benefits directly from Medicare, 'individuals can elect instead to receive their benefits through private insurance companies that contract with [Medicare] to provide 'Medicare Advantage' plans.'" *MSP Recovery Claims, Series LLC v. Nationwide Mut. Ins. Co*, 594 F. Supp. 947, 950 (S.D. Ohio 2022) (quoting *In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.,* 685 F.3d 353, 355 (3d Cir. 2012).  In Medicare Advantage Plans, "participating insurers receive a monthly sum for each beneficiary enrolled." *United States ex rel. Holt v. Medicare Medicaid Advisors, Inc.*, No. 18-cv-860, 2022 U.S. Dist. LEXIS 149893, at *6 (W.D. Mo. Aug. 22, 2022).  Centers for Medicare and Medicaid Services (CMS) "pays Medicare Advantage plans a set, monthly payment regardless of the number of uncovered, unnecessary, or excessive services provided." *United States ex rel.*

*Gray v. UnitedHealthcare Ins. Co.*, No. 15-cv-7137, 2018 U.S. Dist. LEXIS 98195, at *18 (N.D. Ill. June 12, 2018).

> [T]raditional Medicare is potentially harmed every time a service is provided that is not medically necessary or covered, or every time a patient is misdiagnosed leading to additional and unnecessary services…. The government is not harmed when this happens with Medicare Advantage providers because those plans necessarily take on the risk that traditional Medicare normally assumes.

*Id.* at 17–18.  Because the amount that a Medicare Advantage Program receives is calculated based on the number of beneficiaries enrolled and is adjusted based on their health status and other factors rather than the cost of each service, more services "do not result in increased payment from CMS to MAOs." *Holt*, 2022 U.S. Dist. LEXIS 149893, at *8.

But Defendants' argument goes to the *materiality* of the false statement, not the presentment requirement.  And Defendants do not raise a materiality argument, nor could they; "violations of the AKS and Stark Laws are material as a matter of law." *Daugherty*, 2012 U.S. Dist. LEXIS 178641, at *32.  While it is true that CMS payments to Medicare Advantage Organizations do not depend on the volume of claims, that does not mean such claims are not *presented* to the Government. Indeed, each Medicare Advantage Organization "must submit to CMS … the data necessary to characterize the context and purposes of each item and service provided to a Medicare enrollee by a provider, supplier, physician, or other practitioner."  42 C.F.R. § 422.310(b).  Because CMS pays Medicare Advantage Plan recipients, the claim qualifies as a "claim" made to a contractor, grantee, or recipient of Medicare funds under 31 U.S.C. § 3729(2).  Therefore, by presenting false claims to a private organization that is being reimbursed by CMS, Erlanger would necessarily be presenting it to a recipient of Medicare funds.

### 3. Relators are entitled to a relaxed 9(b) pleading standard under *Prather*.

Even if the specific representative claim is not sufficient, the set of facts before the Court falls under the exception outlined in *United States ex rel. Prather v. Brookdale Senior Living Communities., Inc.* 838 F.3d 750, 769 (6th Cir. 2016). In that case, the Court of Appeals for the Sixth Circuit "determined that a relator's specific personal knowledge of a defendant's billing practices may support a strong inference that defendants submitted false claims, thereby satisfying Rule 9(b)'s particularity requirement even without the identification of a specific representative claim." *United States v. Tenet Healthcare Corp.*, No. 24-1785, 2025 U.S. App. LEXIS 9727, at *15 (6th Cir. Apr. 22, 2025). Therefore, this exception applies "when a relator alleges specific personal knowledge that relates directly to billing practices." *Prather,* 838 F.3d 750, at 769. "This could include 'personal knowledge that the claims were submitted by Defendants … for payment' or other 'personal knowledge of billing practices or contracts with the government.'" *Id.* (quoting *Chesbrough v. VPA, P.C.,* 655 F.3d 461, 471–72 (6th Cir. 2011)). But this exception is narrow; it is "limited to circumstances where a relator has detailed personal knowledge of the relevant payment scheme." *Tenet Healthcare Corp.*, 2025 U.S. App. LEXIS 9727, at *16. Indeed, it has only been applied by the Sixth Circuit once, in *Prather* itself.

But the Court finds that Relators in this case possess the kind of personal knowledge contemplated by *Prather*. In *Prather*, the Relator was hired to work on a "project devoted to working through a backlog of Medicare claims … and her responsibilities were focused on reviewing the documentation for those Medicare claims, *in anticipation of them being submitted to Medicare.*" *Prather*, 838 F.3d at 770. Here, Relator Sullivan was the Chief Compliance Officer of Erlanger, where one of her duties included "the collection and detailed review of random samples of actual claims to Government Payers, at the claim line level, drawn from procedures

conducted at Erlanger facilities." (Doc. 119 ¶ 29–30.) Relator Tabor was the former Chief Financial Officer of Erlanger. (*Id.* ¶ 32.) One of his job duties included "supervising the development and creation of periodic reports to Erlanger senior management and the physician contract committee of the Erlanger senior leadership team that showed the value and volume of the referrals of healthcare services to Erlanger by each physician to whom it paid compensation." (*Id.*) He also had "responsibility over the generation of Erlanger's claims to Government Payers and personally reviewed actual claims at the claim line level as necessary." (*Id.* ¶ 33.) He alleges that he has years of "direct personal experience" with the UTCOM pass-through scheme and knows about each physician's referral requirement. (*Id.* ¶ 34.) He also alleges he knew Erlanger determined how much to pay UTCOM faculty members "based on the value and volume of their referrals to Erlanger." (*Id.*)

Relators occupy positions similar to the one occupied by Prather; these were individuals who, like Prather, were reviewing claims for submission and would therefore have "detailed knowledge" of the various schemes. In cases where the Sixth Circuit declined to apply the exception, the focal point was the knowledge of the Relator. *See, e.g. Kettering Health,* 816 F.3d at 414 ("We need not decide whether a relaxed standard exists in this Circuit because Relator lacks the 'personal knowledge' necessary to qualify … Relator does not claim that she worked in [Defendant's] security or billing departments, or that she ever spoke with those directly responsible for [] certification."); *Chesbrough*, 655 F.3d at 471–72 ("Here, the Chesbroughs lack the personal knowledge of billing practices or contracts with the government."). But in this case, the Relators occupied high level supervisory roles that included being personally responsible for reviewing

25

claims submitted to Medicare, like in *Prather*.[2]  Therefore, even if the representative claim did not

adequately plead the entire chain of events, and despite the representative claim not referring to

community physicians, the facts in this case make *Prather* applicable.  Therefore, the claims as to

both the USA Physicians and the community physicians have met the relaxed pleading standard

of Rule 9(b) as outlined by *Prather*.

### C.    Relators may prosecute non-intervened claims.

Erlanger makes two arguments in the alternative as to why these claims must be dismissed.

The first is that relators may not pursue non-intervened claims in cases where the Government has

intervened as to some of the claims, because "the government's decision not to intervene as to

certain claims acts as a tacit dismissal of them."  (Doc. 122 at 25.)  The second is that "the structure

of the FCA's *qui tam* provisions is facially inconsistent with Article II of the U.S. Constitution."

(*Id.* at 27.)  The Court will address each argument in turn.

---

[2]  The Court notes that in the *Adams* Order, the Court conducted an *in camera* review of the original complaint in this matter and found that the *Prather* exception allowing a relaxed pleading standard would apply.  (Case No. 1:21-cv-84, Doc. 176 at 9–10, n.6.)

> The Court finds that the North Carolina relators, due to the nature of their positions at Erlanger, have personal knowledge that claims were submitted by Erlanger, as well as in-depth knowledge of Erlanger's billing practices. Furthermore, the NC Complaint provides specific details of the alleged fraudulent scheme and identifies key details of specific false claims that were allegedly submitted to the Government. Relators' personal knowledge, combined with the details of the fraudulent scheme that the NC Complaint provides, raises a "strong inference" that specific false claims were submitted.

(*Id.*) (internal citations omitted). The Court does not take this finding to be issue preclusive for the same reasons outlined above.  *See supra* section III(A).  However, the Court finds this analysis of the Relators' occupations and job duties to be persuasive.

26

### 1. The FCA allows Relators to proceed with non-intervened claims.

Defendants argue that "once the government has intervened, the relator has no separate free-standing FCA cause of action." (Doc. 122 at 26) (quoting *U.S. ex rel. Becker v. Tooks & Metals, Inc.*, 2009 WL 855651, at *6 (N.D. Tex. Mar. 31, 2009)). Defendants rely on the District of Utah's decision in *United States ex rel. Brooks v. Stevens-Henegar College, Inc.*, in which the Court analyzed Section 3730(b)(1) of the FCA. 359 F. Supp. 3d 1088 (D. Utah 2019). There, the Court found that "[n]othing in the False Claims Act or the legislative history suggests that a relator can maintain the non-intervened portion of an action," and that "the plain language of the statute suggests otherwise." *Id.* at 1116.

Section 3730 of the FCA lays out its *qui tam* provisions. It provides in relevant part that "[i]f the Government proceeds with the action, it shall have the primary responsibility for prosecuting the action." 31 U.S.C. § 3730(c)(1). The *Brooks* Court found the word "action" to mean civil action, not cause of action. *Brooks*, 359 F. Supp. 3d at 1118. The *Brooks* Court pointed to § 3730(b)(1), which explicitly states that a relator may bring a "civil action." *Id.* It also pointed to other areas of the statute in which the statute refers to "an action or claim." *Id.* (citing § 3730(e)(4)(A). The use of this language, the *Brooks* Court argued, supports the "civil action" reading of the statute, because otherwise "the words 'or claim' would be superfluous." *Id.* According to the *Brooks* Court, if the word meant civil action and not cause of action, then once the Government intervenes as to any claims, it has "primary responsibility" for the entire case, precluding Relators from proceeding on the non-intervened claims.

The *Brooks* argument is an outlier, but Defendants appear to misrepresent this fact to the Court. They argue "not all courts have adopted *Brooks'* interpretation of the FCA—but many have." (Doc. 122 at 25.) But as far as this Court knows, none have. *See United States ex rel.*

*Ormsby v. Sutter Health*, 444 F.Supp.3d 1010, 1075–76 (N.D. Cal. 2020) (describing *Brooks* as "the only case … where a district court held that relators have no right to maintain the non-intervened portion of an FCA case after the government intervenes").

The Court has examined the cases Defendants cite as examples of this proposition. Those cases explicitly *do not* adopt their interpretation. In *United States ex rel. White v. Mobile Care EMS & Transport, Inc.*, the Southern District of Ohio acknowledged that the *Brooks* reading is a "genuine possibility" in a situation where "the government had intervened as to only *some* of the claims against a single defendant." No. 1:15-cv-555, 2021 WL 6064363, at *11 (S.D. Ohio Dec. 21, 2021). But the *White* Court explicitly stated that this was "an issue the Court need not, and thus does not, reach." *Id.* Defendants also cite *United States, ex rel. Becker v. Tools & Metals, Inc.*, Nos. 3:05-cv-627-L, 3:05-cv-2301-L, 2009 WL 855651 (N.D. Tex. 2009). That case also does not stand for Defendants' proposition. While the Northern District of Texas said that "once the government has intervened, the relator has no separate free-standing FCA cause of action," it was referring to a particular claim in which the Government *had already intervened. Id.* at *6. The *Becker* Court found that Relators could not remain as parties on that claim because doing so would be duplicative. *Id*. This was not a situation where the court analyzed whether the Relator could remain on a claim in which the Government had not already intervened. In fact, the court explicitly stated the *opposite* of what Defendants here contend; it found that that Relators may continue to act as parties and pursue those claims in which the government did not intervene. *Id*. at 9 ("Accordingly, this court joins other courts that have held that relators are entitled to proceed on their claims when the government only partially intervenes.")

The holdings that Defendants give as example of the "many" holdings adopting *Brooks* either explicitly do not address the issue or reach the exact opposite result. In fact, several other

courts have noted that no other Court has adopted *Brooks*. "Those courts that have expressly considered *Brooks have rejected it.*" *White*, 2021 WL 6064363, at *9 (emphasis added); *see also United States ex rel. Rauch v. Oaktree Medical Centre, P.C.*, No. 6:15-cv-1589, 2020 WL 106595 at *9 (D.S.C. Mar. 5, 2020) ("Indeed, the Court is aware of no case law—other than *Brooks*—that holds that a relator may not litigate non-intervened claims.")

Of course, just because Courts have rejected *Brooks* does not alone make it incorrect. But the Court finds the criticisms of *Brooks* persuasive. While the FCA "is based on the model of a single-claim complaint," now-Justice, then-Judge Alito analyzed Section 3730(e)(4) and found it "clear that each claim in a multi-claim complaint must be treated as if it stood alone." *United States ex rel. Merena v. SmithKline Beecham Corp.,* 205 F.3d 97, 101-102 (3d. Cir. 2000). Furthermore, it is not conceivable to this Court that the Government would only have two options in a FCA case: intervene as to all or none of the claims. Under the *Brooks* reading, this would seem to be the requirement because "the Government must choose to intervene in the 'action' prior to filing its Complaint in intervention." *Rauch*, 2020 WL 1065955, at *8. Even the *Brooks* Court "acknowledges such a reading would be 'troubling if it were true.'" *Id.* (quoting *Brooks*, 359 F. Supp. 3d at 1120).

### 2. Allowing Relators to proceed on non-intervened claims does not violate the Constitution.

Defendants urge this Court to find the *qui tam* provisions of the False Claims Act unconstitutional because "the structure of the FCA's *qui tam* provisions is facially inconsistent with Article II of the U.S. Constitution." (Doc. 122 at 27.) While Defendants recognize that the Sixth Circuit has explicitly upheld the constitutionality of the *qui tam* device against an Article II challenge in *United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.,* 41 F.3d 1032 (6th Cir. 1994), Defendants argue that the findings on which that case is based "plainly conflict with

29

subsequent Supreme Court precedent." (Doc. 122 at 28.)  They argue that a Relator who proceeds on a non-intervened claim would be acting as "an *inferior* Officer who *must* be appointed consistent with Article II." (*Id.*) (emphasis in original).

The Court finds that Relators are not officers because they do not have the kind of significant authority that would subject them to Senate confirmation.  Relators do not "occupy a continuing position established by law." *Lucia v. SEC*, 585 U.S. 237, 245 (2018).  Their office is not static in the sense that their roles are specific to the particular relators bringing the claim.  This is not the kind of continuing position with a high amount of control or authority over an executive function that subsequent Supreme Court cases have contemplated as requiring confirmation.

Indeed, this Court previously found that "the Government could 'significantly restrict[]' a relator's role in litigation, even 'tak[ing] complete control of the case," and [] 'the relator's position is without tenure, duration, continuing emolument, or continuous duties.'" *United States ex rel. Adams v. Chattanooga Hamilton Cnty. Hosp. Auth.*, No. 1:21-cv-84, 2024 U.S. Dist. LEXIS 209546, at *8 (E.D. Tenn. Nov. 7, 2024) (quoting *Taxpayers Against Fraud*, 41 F.3d 1050).  This argument has rightly been rejected by every circuit court to decide the issue.  *Id.* at 6.  Because the Relators are not subject to the Appointments Clause, the *qui tam* provision does not violate Article II of the Constitution.

## IV.    CONCLUSION

For the foregoing reasons, the Court will **DENY** Defendants' motion to dismiss.

**AN APPROPRIATE ORDER WILL ENTER.**

<u>/s/</u>_____
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**